The STATE of Ohio, Appellee,

v.

**TAYLOR, Appellant.**

[Cite as *State v. Taylor* (1996), 114 Ohio App.3d 416.]

Court of Appeals of Ohio,
Second District, Miami County.

No. 95–CA–24.

Decided Sept. 27, 1996.

418

*Gary A. Nasal*, Miami County Assistant Prosecuting Attorney, for appellee.
*John H. Rion*, for appellant.

FAIN, Judge.

Defendant-appellant Jason Taylor appeals from his conviction and sentence, following a plea of no contest, upon the charge of carrying a concealed weapon. Taylor contends that the trial court erred by refusing to grant his motion to suppress certain evidence obtained as a result of a warrantless search of his car after a traffic stop.

We conclude that although the vehicle was lawfully stopped, its impoundment and inventory search were neither authorized nor justified. Accordingly, the judgment of the trial court is reversed, and this cause is remanded for further proceedings consistent with this opinion.

The only testimony provided at the suppression hearing was that of Officer Dewayne Williams and Sergeant Steve Lord of the Covington Police Department in Miami County, Ohio. Officer Williams testified that on November 6, 1994, he observed Taylor traveling west on East Broadway Street in Covington, Ohio, in a 1977 Oldsmobile at approximately 12:47 a.m. As the vehicle passed, Williams noticed that the window tinting on the vehicle appeared exceptionally dark. Indeed, he could not see into it even with the cruiser headlights shining directly on the vehicle. Believing the tinting to exceed the amount allowed by law, Williams pulled the vehicle over and called for backup. Sergeant Lord arrived on the scene soon thereafter. Williams approached the car from the driver's side. He testified that until the driver's window was lowered, he could not see anyone in the vehicle due to the tinting.

Once Williams approached the car, he asked Taylor to step out of the vehicle. He then informed Taylor that he had been stopped for excessive tinting on the vehicle. When first speaking to Taylor, Williams asked if Taylor had any

firearms, drugs or other contraband in the vehicle. Williams testified that Taylor denied possessing any contraband. He further testified that Taylor stated that he knew that the tinting was only about five percent. Williams thereafter checked the tinting with a tint meter, and found that it actually allowed a light transmittance of only 4.4 percent. Williams testified that after using the meter, he determined the vehicle to be unsafe, and decided to remove the car from the roadway.

Williams removed all of the passengers from the car, patted them down, and checked their identification. He also checked the car's registration, and ran a driver's license check on Taylor and the other occupants of the vehicle. Williams testified that the registration and license inquiries were unremarkable. The vehicle was registered to Taylor. None of the license checks indicated that there were any outstanding warrants or any "armed and dangerous" reports for any of the vehicle's occupants. Thereafter, the passengers were allowed to leave.

Williams testified that a tow truck was called. In preparation for the impound-ment, Taylor's vehicle was secured by conducting an administrative vehicle inventory search. This search revealed a pistol. Taylor was issued a citation for the window tint violation, and was arrested for carrying a concealed weapon.

Upon cross-examination, Williams testified that he checked identification of all of the passengers because they were acting in a very suspicious manner. Williams said the occupants were "very uneasy, very anxious, not wanting to look or talk directly to [him] in any way." According to Williams, during this stop, the occupants' level of nervousness, anxiety, and unease was higher than is normal for a traffic stop. Williams testified that most people will look at, and talk directly to, the officer. Williams also testified that a "light went off" when he noted the manner in which Taylor watched him in his side view mirror. The officer continued, "People do not react that way on a routine traffic stop in the manner that they constantly fix their gaze upon you, keeping an eye on your location at all times." Williams became suspicious that the situation was some-thing more than an ordinary traffic stop. Williams was not able to observe anyone making furtive movements or attempting to hide anything due to the excessive tinting. When he reached the point where he could see into the car through the driver's window no one was moving furtively due to fact that he told them to keep their hands raised.

Williams did not allow Taylor the option of driving the vehicle away or of arranging to use a towing service to remove the vehicle from the road. Williams further testified that the car was searched as an administrative inventory search, and not because the occupants were acting suspiciously. He also testified that he had decided to have the vehicle towed before he checked the window tint.

Sergeant Lord testified that he acted as backup on the traffic stop. He also stated that he could not see into the vehicle. Even when he used his flashlight, he could see only shadowy figures. He testified that he tows cars for certain equipment violations; for example, he stated that he might tow a car for having two headlights out, but not for having just one faulty headlight. He stated that he did not normally tow cars for window tint, but agreed with Officer Williams's decision to tow. He also stated that he had never been involved in a traffic stop of a vehicle with such a high level of tinting.

The trial judge denied Taylor's motion to suppress. The trial court found that the initial stop was lawful, and that the "officer's decision to remove the vehicle from the roadway on which it was parked for public safety purposes was also appropriate and reasonable under the circumstances."

Taylor's sole assignment of error is as follows:

"Appellant's conviction for carrying a concealed weapon must be reversed because the car was seized in violation of the Fourth Amendment."

Taylor's argument on appeal is twofold. Initially, he contends that there was no justification for the traffic stop of his vehicle. Additionally, he argues that even if the stop was reasonable, the police had no authority to impound or to inventory his vehicle.

■ At the outset, we note that the trial court found that the stop of Taylor's vehicle was valid, finding that the level of tinting was sufficient to create probable cause to believe that a motor vehicle violation had occurred. We agree.

■ Stopping a vehicle is a Fourth Amendment seizure, which requires a balancing of the public's privacy interests against the legitimate government interest behind the stop to determine whether the seizure is reasonable. *Delaware v. Prouse* (1979), 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660. Ensuring that motor vehicles are safe for operation is clearly a legitimate governmental interest sufficient to justify brief, investigatory stops. *Id.* at 658, 99 S.Ct. at 1398, 59 L.Ed.2d at 670–671. In the case before us, the governmental interest in preventing unsafe window tinting is codified in R.C. 4513.241(A), which authorizes the Ohio Director of Public Safety to promulgate rules governing the use of tinted glass in motor vehicle windows. The statute requires that any window tinting in motor vehicles must allow a "light transmittance of not less than fifty per cent plus or minus three per cent." Ohio Adm.Code 4501–41–03(A)(3). Any person who violates this regulation is guilty of a minor misdemeanor. R.C. 4513.99(A).

Officer Williams's unrefuted testimony was that when he first noticed the vehicle, he observed that the window tinting was so excessive that he could not

see into it even with his headlights shining directly on the windows. We agree that this could have reasonably caused Williams to suspect that Taylor's vehicle was unsafe and in violation of R.C. 4513.02. This supports the trial court's conclusion that the vehicle was lawfully stopped. Therefore, we find that the initial stop of Taylor's car was reasonable, and did not violate his Fourth Amendment rights.

■ We next turn to Taylor's argument that the state exceeded its authority in impounding his vehicle, and that the subsequent inventory search was illegal. The state cannot justify its search as having been incident to a lawful arrest, because under ordinary circumstances the commission of a minor misdemeanor will not support an arrest. Furthermore, the record clearly shows that the officer did not arrest Taylor as a result of the window tint violation, but merely issued a citation. We also note that the state has not tried to justify its search of the vehicle under the "search incident to arrest" exception to the requirements of the Fourth Amendment.

■■ The state bears the burden of establishing that a warrantless search is valid under one of the exceptions to the warrant requirement. The state argues that the search of Taylor's vehicle was a valid inventory search, citing *Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 524 N.E.2d 889. Inventory searches of automobiles have consistently been upheld by the United States Supreme Court as permissible warrantless searches in cases where vehicles are "impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents." *S. Dakota v. Opperman* (1976), 428 U.S. 364, 373, 96 S.Ct. 3092, 3099, 49 L.Ed.2d 1000, 1007–1008. The Ohio Supreme Court has also upheld the standard inventory search of a lawfully impounded vehicle "when the evidence does not demonstrate that the procedure involved is merely a pretext for an evidentiary search of the impounded vehicle." *State v. Robinson* (1979), 58 Ohio St.2d 478, 480, 12 O.O.3d 394, 395–396, 391 N.E.2d 317, 318. The inventory exception to the warrant requirement exists in order to promote the public policies of (1) protecting an owner's property while it is in police custody, (2) insuring against a claim of lost, stolen or vandalized property, and (3) guarding police from danger. *Florida v. Wells* (1990), 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1, 6–7.

■ The United States Supreme Court has emphasized the requirement that inventory searches be done in accordance with standardized criteria. *S. Dakota v. Opperman*, 428 U.S. at 374–375, 96 S.Ct. at 3099–3100, 49 L.Ed.2d at 1008–1009. Once a vehicle is impounded, police may conduct an inventory search provided it is done in good faith and in accordance with reasonable standardized procedures or established routine. *State v. Hathman* (1992), 65 Ohio St.3d 403, 604 N.E.2d 743. Here, there was unrefuted testimony that the inventory was

done in accordance with established procedures. Williams followed a standard inventory form routinely utilized by the Covington Police Department.

However, in order to determine whether the inventory search in the case before us was permissible, we must first determine whether the vehicle was lawfully impounded. The question we must answer then is what constitutes a lawful impoundment.

"In determining the lawfulness of the impoundment, authority to impound should never be assumed. A car may be impounded if it is evidence in a criminal case, used to commit a crime, obtained with funds derived from criminal activities, or unlawfully parked or obstructing traffic; or if the occupant of the vehicle is arrested; or when impoundment is otherwise authorized by statute or municipal ordinance.

" * * *

"An impoundment implies some public policy purposes being served; a legitimate purpose should not be assumed." Katz, Ohio Arrest, Search and Seizure (1996), 224–25.

The state contends that the statutory authority to impound Taylor's vehicle is contained within R.C. 4513.02(E), which reads as follows:

"When any motor vehicle is found to be unsafe for operation, the inspecting officer may order it removed from the highway and not operated, except for purposes of removal and repair, until it has been repaired pursuant to a repair order as provided in division (F) of this section."

The state claims that the plain meaning of the statute allows impoundment and towing. We decline to accept this interpretation of the statute.

"In construing a statute, a court's paramount concern is the legislative intent in enacting the statute. * * * In determining legislative intent, the court first looks to the language in the statute and the purpose to be accomplished. * * * Words used in a statute must be taken in their usual, normal or customary meaning. * * * [I]t is the duty of the court to give effect to the words used and not to insert words not used. * * * Where the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need to apply rules of statutory interpretation. * * * However, where a statute is found to be subject to various interpretations, a court called upon to interpret its provisions may invoke rules of statutory construction in order to arrive at legislative intent." *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.* (1994), 69 Ohio St.3d 217, 631 N.E.2d 150.

Obviously the purpose of the statute in question is to aid in ensuring that unsafe vehicles are taken out of operation until repaired. The statute does not expressly provide for, or purport to authorize, the impoundment of unsafe

vehicles. We believe that a plain reading of the statute expressly allows an officer to effect the purpose of the statute by giving him the power to order that a vehicle be *removed* from the roadway. This statute provides for the removal, not the impoundment, of unsafe vehicles. This is not a mandatory statute. It employs the word "may," which is "generally construed to render optional, permissive, or discretionary the provision in which it is embodied * * *." *State ex rel. Niles v. Bernard* (1978), 53 Ohio St.2d 31, 7 O.O.3d 119, 372 N.E.2d 339. The statute also expressly allows the vehicle to be operated for the purposes of removal. However, there is no express language in the statute to authorize a police officer to impound and to tow the unsafe vehicle. In light of the fact that the statute clearly and unambiguously provides the means by which the officer may effect the purpose of the statute, we decline to read into the statute an authority to effect the impoundment of an unsafe vehicle when the statute does not expressly so provide. Other statutes, such as the recent statutory provisions relating to driving under the influence or under an administrative license suspension, expressly provide for the impoundment of motor vehicles under defined circumstances, thereby suggesting that the General Assembly can be expected to provide expressly for the remedy of impoundment if it should be deemed necessary for the accomplishment of its legislative purposes. See R.C. 4503.233. Furthermore, if the subject of the police officer's order to remove the unsafe vehicle from the road until it is repaired should fail to do so, significant penalties are provided for disobeying a lawful order of a police officer. R.C. 2921.331.

Significantly, statutes that provide expressly for impoundment, like the statutes concerning driving while impaired or driving under suspension, also provide for the ultimate disposition of the vehicle following impoundment. If we were to hold that R.C. 4513.02(E) provides implicitly for the impoundment of an unsafe motor vehicle, the legal consequences following the impoundment of the vehicle would be unclear. Who would repair the vehicle? If it were the owner of the vehicle who must cause the repairs to be made, how would the owner gain access to the impounded vehicle? If it were law enforcement who must cause the repairs to be made, what would be the mechanism by which the owner would be required to reimburse the expense? (We cannot imagine that the General Assembly would have intended that the repairs be effected at public expense!) And how would the owner of the vehicle be protected from the incurring of unreasonable repair expenditures? Surely the General Assembly would have addressed these issues if it had intended in R.C. 4513.02(E) to authorize the impoundment of an unsafe motor vehicle.

Based upon the foregoing, we find that while Taylor's vehicle was legitimately stopped, there was no authority to impound the vehicle under the state's claimed statutory authority. The state has not set forth any other statute under which it

claims such authority exists. Nor was there any proof at the hearing that any other circumstances authorized the impoundment. Because we find that the impoundment was unauthorized, we find that the subsequent inventory of the contents of the vehicle, although performed in accordance with standardized procedure, was unlawful.

Taylor's sole assignment of error is sustained. The judgment of the trial court is reversed, and this cause is remanded for further proceedings consistent with this opinion.

*Judgment accordingly.*

WOLFF, J., concurs.

GRADY, J., concurs separately.

GRADY, Judge, concurring.

I agree that because a violation of R.C. 4513.02(E) confers no authority on an officer to seize a vehicle that is found to be unsafe for operation, no concomitant right of impoundment exists to reasonably justify a warrantless search of the vehicle. However, our holding does not preclude an impoundment search of a vehicle that has been abandoned, either because it is unsafe for operation or for another reason, when the officer has a valid reason to have the vehicle removed from the place where it was abandoned. Traffic safety is such a valid reason. As Judge Fain points out, in this instance the officer's direction to the driver to leave the vehicle where it was stopped does not present that circumstance.