934 A.2d 38

STATE of Maryland

v.

Arvel D. WILLIAMS.

No. 39, Sept. Term, 2007.

Court of Appeals of Maryland.

Oct. 19, 2007.

Steven L. Holcomb, Asst. Atty. General (Douglas F. Gansler, Atty. General, Baltimore) on brief, for Appellant.

Lisa J. Sansone (Law Office of Lisa J. Sansone, Baltimore; Warren A. Brown, Warren A. Brown, P.A., Baltimore) on brief, for Appellee.

Argued before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER, (Retired, Specially Assigned), and DALE R. CATHELL, (Retired, Specially Assigned), JJ.

ALAN M. WILNER, Judge, Retired, Specially Assigned.

In this prosecution of appellee for violations of the controlled dangerous substance laws, the Circuit Court for Harford County entered an order suppressing as evidence suspected cocaine and marijuana seized from appellee's car following a pretextual traffic stop. The order was based on a finding that the seizure violated appellee's rights under the Fourth Amendment to the U.S. Constitution. Acting under Maryland Code, § 12–302(c) of the Cts. & Jud. Proc. Article, the State appealed that decision. We granted *certiorari* before proceedings in the Court of Special Appeals and, on September 12, 2007, filed an Order affirming the order of the Circuit Court. We now explain the basis for our Order.

## *BACKGROUND*

The facts regarding the stop came entirely from evidence presented at the hearing on appellee's motion to suppress. We take that evidence, and the inferences fairly deducible from it, in a light most favorable to appellee, who prevailed on the motion. In determining the ultimate question of whether the seizure of appellee effected by the stop and the subsequent search of his car violated his rights under the Fourth Amendment, however, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990); *Dashiell v. State,* 374 Md. 85, 93–94, 821 A.2d 372, 377 (2003).

The stop was made by Harford County Deputy Sheriff Wood at about 12:40 a.m. on May 8, 2006. While at the precinct station prior to his coming on duty an hour earlier, Deputy Wood was advised to be on the lookout for a black Mercury Grand Marquis with a specific license plate number because the vehicle "possibly was carrying CDS," and to stop the car if he observed a violation. The basis of that suspicion is not in the record before us, but the State has not argued that it sufficed to provide any independent ground to justify a stop.

While driving south on I–95, Wood noticed the car so described in front of him. The driver, appellee, was not apparently violating any traffic laws. Wood followed the car for a half mile or so, and, when it exited the highway at the ramp to Md. Route 152, Wood stayed behind it. Just prior to exiting the highway, Wood radioed his dispatcher that he had the suspect car in sight. He received a response from a K–9 officer who was monitoring the communication. Appellee stopped at the end of the ramp for a red light, at which point Wood's car was about ten to twelve feet behind appellee's. At that point, Wood informed the K–9 officer that he intended to stop the car, and, shortly after appellee made his turn when the light turned green, he did so.

It does not appear from the record that Deputy Wood believed that he had any legitimate reason to stop the car until they approached the end of the exit ramp, at the traffic light. The intersection, Wood said, was well lit. At that point, he concluded that the rear window of appellee's car was darker than "normal." He came to that conclusion because, based on his "training and experience with the Sheriff's Office and traffic stops [he had] made," he should have been able to see into the car with the area so well lit, but that he was unable to do so. His testimony in that regard was:

"Q. So normally, *in a normal vehicle,* you would be able to see through the rear window, is that what you're saying?

A. Yes.

Q. So in this case, when you looked at the rear window, could you see through?

A. No, I could not."

(Emphasis added).

Wood stated that the vehicle "appeared to have tint" that was "after-market," *i.e.,* that had been applied after the car was manufactured and sold. Wood knew of a statutory requirement, discussed below, that after-market tinting must allow at least 35% of light to be transmitted through the window and stated that he had previously issued about twelve repair orders for tinting violations, but he acknowledged that he had never received any specific training with respect to tinting. Rather, he claimed that "[i]f the officer feels it's too dark, they can stop the car and issue a repair order." That, he said, was the standard he applied: "if the officer in their own opinion feels it's too dark, then you can stop the vehicle."

Deputy Wood noted that there were instruments—tint meters—that could measure whether a tint exceeds the statutory limit, but he was never trained in their use, did not know how to use them, and did not have one. He concluded that the rear window of appellee's car had excessive tinting for no reason other than it "appeared dark to me." Confirming his direct testimony, he acknowledged on cross-examination that he did not purport to determine whether the window appeared to be *illegally* tinted, but only whether it was "*other than what normal windows would appear, a car that did not have any kind of after-market tinting.*" (Emphasis added). He emphasized that standard several times:

"Q. Okay, but my point is: When you say appeared dark, is that in relationship to other tints, in other words, or just appeared dark, period?

A. *Appeared darker than a normal window, sir, without tinting.*

Q. Okay, and so let me get this straight. Your reason for stopping was not that it may have been—the tint may have been illegal, but the window appeared darker than—

A. *I knew there was tint on the window, sir. That's why I stopped the vehicle."*

(Emphasis added).

Wood also stated that he did not observe "any kind of tags or inspection stickers" on the window at that time. He explained that, when a person is issued a repair order for window tint and has it checked for compliance, "a sticker is usually placed on the window saying that, you know, the certification was done or the test was done." Wood acknowledged that such a sticker would be attached after a repair order is issued.

Upon stopping the car, Wood advised appellee that the stop was for a tint violation and that he would be issued a repair order. Wood returned to his car to do a license and warrant check. When the check revealed a valid license and no warrants, Wood prepared an equipment repair order. At that point, the K–9 officer arrived, and, when the dog alerted for CDS, appellee's vehicle was searched. Suspected cocaine and marijuana was found, and appellee was arrested.

Four days later, faced with the equipment repair order, appellee took the car to the State Police Automotive Safety Enforcement Division, which found that the windows did allow 35% light transmittance and were therefore legal and would pass Maryland inspection laws. A certificate to that effect was placed in evidence. Appellee testified, without contradiction, that the windows were in the same condition at the time of inspection as they were at the time of the stop.

On this evidence, and after hearing argument, the suppression court drew a distinction between suppressing the repair order and suppressing the CDS. As to the former, the court declared that "[i]f you put after-market tinting on, the officer can make him go have it checked out." In essence, the court accepted the notion that "it's his [the officer's] judgment and he can make him go to State Police." With respect to the CDS, however, the court regarded the issue as one of "public policy," namely, that "[w]hen you can't find anything else to stop the car for, [you should not] be able to stop him because

the window tinting appears to be too dark, when, *in fact,* it's not too dark." (Emphasis added). The court explained:

"To me, it comes down to a matter of, you take your chances if you use that basis and it turns out you're not right. The evidence you seized gets suppressed. And then it takes away the incentive to use that line of reasoning. Seems to me as a matter of public policy that if you're going to use window tinting as a basis to make a stop, and to do a K–9 scan, that you have to be right on."

On that basis, the court granted the motion to suppress, and the State filed this appeal.

## DISCUSSION

### Tinting Requirements

The ultimate Fourth Amendment issue presented hinges largely on the Maryland law governing the tinting of vehicle windows, and that requires some explanation.

There are Federal regulations adopted by the National Highway Traffic Administration of the U.S. Department of Transportation governing glazing materials (windows) used in motor vehicles. The Federal regulations adopt American National Standard Z26, which, in pertinent part, requires that windshields and front side windows installed in passenger cars by automobile manufacturers transmit at least 70% of the light striking them.[1] *See* 49 C.F.R. § 571.205 and ANS Z26. The Federal regulation applies only to the windows installed by the manufacturer, not to post-manufacture tinting, and it does not apply to rear windows of passenger cars.

The post-manufacture tinting of motor vehicle windows, which is normally done through a plastic film or metallic laminate applied to the interior side of the window, is regulated largely at the State level, and the standards vary from State to State. In Maryland, post-manufacture tinting is

---

1. The technical term used in the regulation is "visual light transmission."

governed by statutes found in titles 22 and 23 of the Transportation Article of the Maryland Code, which deal with vehicle equipment and inspection, and regulations adopted jointly by the Motor Vehicle Administration (MVA) and the Automotive Safety Enforcement Division of the State Police (ASED). With exceptions not relevant here, § 22–101 of the Transp. Article prohibits a person from driving on any highway a vehicle that is equipped in any manner in violation of title 22. Violation of § 22–101 constitutes a misdemeanor. *See* Transp. Article, § 27–101(a).

Subtitle 4 of title 22 establishes the requirements for certain kinds of vehicle equipment. Of special relevance here is § 22–406, which governs glazing material in motor vehicles. The first part of that section concerns shatter-proof safety glass. Subsection (i) deals specifically with tinting. With an exception not relevant here, § 22406(i)(1)(i) prohibits a person from operating a passenger vehicle on a highway of the State if "there is affixed to any window of the vehicle any tinting materials added to the window after manufacture of the vehicle that do not allow a light transmittance through the window of at least 35%." Section 22–406(i)(2) provides:

"If a police officer observes that a vehicle is being operated in violation of paragraph (1) of this subsection, the officer may stop the driver of the vehicle and, in addition to a citation charging the driver with the offense, issue to the driver a safety equipment repair order in accordance with the provisions of § 23–105 of this article."

Two other statutes are pertinent, both in title 23, which deals with the inspection of vehicles. Section 23–104(a) provides, in relevant part, that every vehicle driven on the highways in this State must have glazing equipment "meeting or exceeding the standards established jointly by the [MVA] and the [ASED]." Section 23–104(b)(2) requires those agencies to adopt regulations consistent with Federal law for that kind of equipment, and they have done so. Section 23–105(a)(1), mirroring § 22–406(i)(2), provides that, "[i]f a police officer observes that a vehicle registered in this State is being operated with any equipment that apparently does not meet

the standards established under this subtitle ... the officer shall stop the driver of the vehicle and issue to him a safety equipment repair order." Such an order requires the owner of the vehicle to have the equipment corrected as necessary within 10 days.

Section 22–406(i)—establishing the 35% transmittance requirement—was enacted in 1995. Four years earlier, MVA and ASED had jointly adopted a regulation dealing with post-manufacture tinting. See 18:2 Md. Register 184, 186 (Jan. 25, 1991); 18:6 Md. Register 686 (Mar. 22, 1991). That regulation, in substantially the same form, remains in effect. See COMAR 11.14.02.14.[2] The regulation, which relates to the vehicle inspection program, is set forth in two columns, one entitled "Procedures" and the other entitled "Reject Vehicle If."

The "Procedures" column directs inspectors to inspect all glass for "tinting that is not incorporated into the glazing" and states that, for passenger cars, "[t]his type of added tinting is only acceptable" if it meets six requirements: (1) it is not reflective; (2) it is not red, yellow, or amber in color; (3) "when used in conjunction with the safety glazing the light transmittance is at least 35 percent"; (4) "a label provided by the tinting material manufacturer½ × 1–½ inches containing the manufacturer's name and the percentage of light transmittance is permanently installed in the ... lower left of rear windows when viewed from the outside"; (5) "the label is installed between the tinting and glazing materials"; and (6) "the vehicle is equipped with an outside rearview mirror on each side." Consistently, the "Reject Vehicle If" column directs the inspector to reject a vehicle if "[t]inting is not

---

2. The bill enacting § 22–406(i) was the subject of considerable debate. Legislation dealing with post-manufacture tinting had been before the General Assembly in 1994. The 1995 bill initially would have prohibited post-manufacture tinting altogether. It was amended first to allow for tinting that would permit only 30% transmittance but ultimately was amended to impose a 35% transmittance requirement. As noted, the requirements in other States vary widely, some requiring, for rear passenger car windows, a 50% transmittance, others permitting a total blockage of light.

incorporated into the glazing except as noted in the procedures and as permitted by federal law."

The amalgam of these statutes and the MVA–ASED regulation is that (1) post-manufacture tinting is permissible provided that it allows at least 35% light transmittance and the other conditions set forth in the regulation, including the requirement that a label stating the percentage of light transmittance be permanently attached to the window between the glass and the tinting material, are satisfied, but (2) if a police officer observes a vehicle being driven on a highway that is not in compliance with those requirements, the officer may stop the vehicle and issue both a citation for the traffic offense and a vehicle equipment repair order.

### *The Appropriate Standard*

The stop at issue here was what is commonly referred to as a *Whren* stop. It is clear, and not really disputed, that Deputy Wood used what he believed to be a tinting violation as a pretext to stop the car in order to allow a backup K–9 officer time to arrive and scan the car for suspected CDS. In *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Supreme Court found no Constitutional impediment to such a pretextual stop, provided the officer has sufficient cause to believe that the traffic violation upon which the stop is, in fact, based has occurred.

Citing *Delaware v. Prouse*, 440 U.S. 648, 653–54, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667 (1979), the *Whren* Court acknowledged that even the temporary detention of an individual during the stop of an automobile constitutes a "seizure" of the person for Fourth Amendment purposes and that an automobile stop is therefore subject to the requirement that it not be "unreasonable" under the circumstances. The Court also confirmed that "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 809–810, 116 S.Ct. at 1772, 135 L.Ed.2d at 95. When such probable cause exists, any ulterior motive of the officer is largely irrelevant: "[s]ubjective intentions play no

role in ordinary, probable cause Fourth Amendment analysis." *Id.* at 813, 116 S.Ct. at 1774, 135 L.Ed.2d at 98. *See also Devenpeck v. Alford,* 543 U.S. 146, 153, 125 S.Ct. 588, 594, 160 L.Ed.2d 537, 545 (2004) (an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause").

In holding that, in a *Whren* pretextual stop, the police must have *more* than probable cause but must, instead, be proven right in their judgment that a traffic violation has occurred—that "you have to be right on or you lose your evidence as a result"—the suppression court created and enforced a Fourth Amendment standard wholly inconsistent with *Whren,* with both pre-and-post Whren Fourth Amendment jurisprudence, and with common sense. It is inconsistent with pre-Whren jurisprudence, in particular *Delaware v. Prouse, supra,* which confirmed that probable cause (or at least reasonable articulable suspicion, *see infra*) was the standard of reasonableness for a traffic stop. It is inconsistent with *Whren,* which both confirmed that probable cause would suffice to justify any traffic stop, including a pretextual one, and made clear that the subjective motivation of the officer was irrelevant. If a higher standard than probable cause is imposed in a pretextual stop, the subjective motivation of the officer would not only be relevant, but controlling.

The standard imposed by the suppression court defies logic for two reasons: first, it judges the conduct of the officer based not on what was reasonably apparent at the time of the stop but on facts that may not come to light until later, of which the officer could not have been aware; and second, it effectively holds the officer to having proof of guilt beyond a reasonable doubt, which has never been required to justify even a formal arrest, much less a temporary traffic stop. For largely these reasons, post-*Whren* decisions have uniformly rejected the notion that the validity of a *Whren* stop must be judged by whether the officer's perceptions are ultimately proved correct. *See Ciak v. State,* 278 Ga. 27, 597 S.E.2d 392, 395–96 (2004); *State v. Cohen,* 347 N.J.Super. 375, 790 A.2d

202, 205 (App.Div.2002); *United States v. Weaver,* 145 Fed. Appx. 639 (11th Cir.2005).

Although it is clear that the standard employed by the suppression court, of absolute correctness, is not a valid one, there seems to be some imprecision as to what *will* justify a traffic stop—whether the officer needs probable cause to believe that a traffic offense has been committed or only a *Terry v. Ohio* reasonable articulable suspicion that such is the case. Courts, including the Supreme Court and this Court, have mentioned both of those standards in the context of traffic stops. The prevailing view among courts that have resolved that issue, and the view that we shall adopt, is that the appropriate minimum standard is reasonable articulable suspicion.

In *Delaware v. Prouse, supra,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660, the Court considered whether a police officer violates the Fourth Amendment by randomly stopping a car for the sole purpose of checking the operator's driver's license and the vehicle registration "where there is *neither* probable cause to believe *nor* reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable law." *Id.* at 650, 99 S.Ct. at 1394, 59 L.Ed.2d at 665 (Emphasis added).

Throughout the Opinion, the *Prouse* Court mentioned both standards, although it seemed to accept the lesser reasonable articulable suspicion standard as the applicable minimum. It observed at one point that the permissibility of a law enforcement technique is judged by balancing its intrusion on Fourth Amendment rights against legitimate governmental interests and that, when so implemented, "the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' *whether this be probable cause or a less stringent test."* *Id.* at 654, 99 S.Ct. at 1396, 59 L.Ed.2d at 668 (Emphasis added). It noted that reasonable suspicion was the

test applicable to roving patrol stops by Border Patrol agents. Still later, it concluded that "[w]here there is not *probable cause* to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations *or other articulable basis amounting to reasonable suspicion* that the driver is unlicensed or his vehicle unregistered," there was no legitimate basis upon which the officer could decide whether stopping a particular driver for a spot check would be any more productive than stopping any other driver. *Id.* at 661, 99 S.Ct. at 1400, 59 L.Ed.2d at 672 (Emphasis added).

The ultimate holding of the *Prouse* Court was that "except in those situations in which *there is at least articulable and reasonable suspicion* that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law," stopping the vehicle merely to do a license or registration check is unreasonable under the Fourth Amendment. *Id.* at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 673 (Emphasis added). The language used by the Court suggests that the lesser articulable suspicion standard is to be applied to routine traffic stops although, because the Court ultimately found neither probable cause nor articulable suspicion, it was unnecessary to resolve that issue.

*Whren*, though relying heavily on *Delaware v. Prouse*, spoke only in terms of probable cause. As noted, after confirming that even a temporary detention during a traffic stop constitutes a "seizure" for Fourth Amendment purposes and thus must be reasonable, the Court iterated that, "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810, 116 S.Ct. at 1772, 135 L.Ed.2d at 95. That reference to probable cause, and others in the *Whren* Opinion, may be taken as mere truisms rather than the fixing of probable cause as a minimum standard—that where probable cause exists, the search or seizure is ordinarily regarded as reasonable—especially since it was conceded that the officer had probable cause to believe

that a traffic violation had occurred and the issue was whether something *more* than that was required.

*Knowles v. Iowa,* 525 U.S. 113, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998), decided two years after *Whren,* lends support to the notion that a routine traffic stop may be based on reasonable articulable suspicion. In that case, the officer stopped a car for speeding. Under Iowa law, the officer could have arrested the driver, but instead he merely issued a citation. As a "search incident to the citation," however, he proceeded to search the car and discover CDS. It was admitted that there was no probable cause for the search; the only question was whether the Iowa law that permitted such a search as incident to the citation was valid under the Fourth Amendment. A unanimous Court held that it was not.

In reaching that result, the Court noted that the "search incident to arrest" exception to the warrant requirement rested, in part, on concerns for officer safety but that the threat to officer safety from issuing a traffic citation was much less than that arising from a formal arrest. In that regard, quoting in part from *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 334 (1984), the Court concluded that "[a] routine traffic stop, on the other hand, is a relatively brief encounter and 'is more analogous to a so-called "*Terry* stop" ... than to a formal arrest.'" *Knowles,* 525 U.S. at 117, 119 S.Ct. at 488, 142 L.Ed.2d at 498. The Court quickly added the caveat that concern for officer safety was not entirely absent in a traffic stop, and that, under *Terry* principles, the officer could order the driver and passengers out of the car, "perform a 'patdown' of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous," and "conduct a '*Terry* patdown' of the passenger compartment of a vehicle upon reasonable suspicion that an occupant is dangerous and may gain immediate control of a weapon." *Id.* at 117–18, 119 S.Ct. at 488, 142 L.Ed.2d at 498.

This Court has mentioned both standards in terms of traffic stops. In *Ferris v. State,* 355 Md. 356, 369, 735 A.2d 491, 497–98 (1999), citing *Whren,* we concluded that a traffic stop "does

not initially violate the federal Constitution if the police have probable cause to believe that the driver has committed a traffic violation." We iterated that standard in *State v. Green,* 375 Md. 595, 609, 826 A.2d 486, 494 (2003) ("when a police officer has probable cause to believe that a driver has broken a traffic law, the officer may detain the driver temporarily"). In *Rowe v. State,* 363 Md. 424, 433, 769 A.2d 879, 884 (2001), however, though repeating that precept, we added that "[a] traffic stop may also be constitutionally permissible where the officer has a reasonable belief that 'criminal activity is afoot,'" citing *Terry.* Immediately following that statement, we cited *Delaware v. Prouse* for the proposition that the Fourth Amendment is violated when there is *neither* probable cause nor reasonable suspicion to believe that the car is being driven unlawfully.

Most of the courts that have chosen, or been required, to determine which of those standards applies to a routine traffic stop, including a *Whren* stop, have held that probable cause is *not* ordinarily required and that a stop is justified under the Fourth Amendment if the officer had a reasonable articulable suspicion that a traffic law has been violated. *See United States v. Callarman,* 273 F.3d 1284, 1287 (10th Cir.2001) ("While either probable cause or reasonable suspicion is sufficient to justify a traffic stop, only the lesser requirement of reasonable suspicion is necessary"); *United States v. Sanchez–Pena,* 336 F.3d 431 (5th Cir.2003); *United States v. Hill,* 195 F.3d 258, 264 (6th Cir.1999); *United States v. Navarrete–Barron,* 192 F.3d 786, 790 (8th Cir.1999); *United States v. Lopez–Soto,* 205 F.3d 1101 (9th Cir.2000); *United States v. Chanthasouxat,* 342 F.3d 1271 (11th Cir.2003); *State v. Chavez,* 668 N.W.2d 89 (S.D.2003); *State v. Bohannon,* 102 Hawai'i 228, 74 P.3d 980 (2003); and *cf. State v. Crawford,* 275 Kan. 492, 67 P.3d 115 (2003).

We believe that is the appropriate test for an initial traffic stop, including a *Whren* stop. The references to probable cause in some of the Supreme Court cases and this Court's cases, we think, are in the context of simply noting the obvious—that if the officer has probable cause, the stop is

reasonable—and not as an indication that probable cause is the minimum standard for such a stop.

## This Case

■ The question, then, is whether, based on the evidence presented at the suppression hearing, Deputy Wood had a reasonable articulable suspicion that the rear window of appellee's car exceeded the level of tinting permitted by Transp. Art. § 22–406(i), as supplemented by COMAR 11.14.02.14, and thus also violated Transp. Art. § 22–101. We have recounted that evidence, and we conclude that it did *not* suffice to give Deputy Wood that level of reasonable suspicion.

The State cites a number of out-of-State cases in which stops for tinting violations were upheld based on the officer's visual observations, without the benefit of tint meter field tests. *See United States v. Weaver, supra,* 145 Fed.Appx. 639 (11th Cir.2005); *United States v. Wallace,* 213 F.3d 1216 (9th Cir.2000), *cert. denied,* 531 U.S. 974, 121 S.Ct. 418, 148 L.Ed.2d 323 (2000); *Ciak v. State, supra,* 278 Ga. 27, 597 S.E.2d 392 (2004); *State v. Moore,* 791 So.2d 1246 (Fla.Dist.Ct. App.2001) Although those cases are distinguishable on their facts, we do not disagree that an officer's observations may be the basis for such a stop, if those observations truly suffice to give a reasonable articulable suspicion that one or more windows are not in compliance with the statutory and regulatory requirements.

The problem here is not just the absence of any objective measurement of the tinting, which, under current technology, may well be unfeasible prior to a stop. It is, rather, that, in noting that appellee's rear window was darker than "normal," Deputy Wood was comparing the darkness of the rear window to a window without any tinting. Obviously, a tinted window is going to appear darker than a window without any tinting, especially at night; that is the natural effect of tinting. The law permits a substantial tinting, however—substantial enough to block out 65% of the light striking the window.

■ The test urged by the State, and applied by Deputy Wood, would allow police officers to stop any car with any tinted window, simply because it appears darker than an untinted window, and that cannot be the test for Fourth Amendment purposes, for it would effectively strip away Fourth Amendment protection for any person driving or owning a car with tinted windows. If an officer chooses to stop a car for a tinting violation based solely on the officer's visual observation of the window, that observation has to be in the context of what a properly tinted window, compliant with the 35% requirement, would look like. If the officer can credibly articulate that difference, a court could find reasonable articulable suspicion, but not otherwise.[3]

Chief Judge Bell and Judge Greene concur generally in this Opinion but would hold that, when conducting a pretextual

---

**3.** There are two other aspects not argued in this case but which may be relevant to stops for tinting violations. First, the issue here is only the validity of the pretextual stop, not the equipment repair order or the indictment for the CDS violations. As presented in both the Circuit Court and this Court, the validity of the stop depends on the application of Fourth Amendment jurisprudence, and, as to that, we have concluded that the proper standard is reasonable articulable suspicion. Appellee has not argued that some higher standard is required under Maryland law. We do note, however, that, to justify actually *charging* a person with a motor vehicle violation, Maryland law requires that the officer have probable cause to believe that the person has committed the violation. *See* Maryland Code, § 26–201(a) of the Transp. Article.

Second, as noted, COMAR 11.14.02.14 requires, for post-manufacture tinting, that a label, ½ × 1-½ inches, denoting, among other things, the percentage of light transmittable, be permanently attached to the window, between the glass and the tinting film or laminate. If an officer stops a car based solely on a conclusion, derived from his or her visual observations of the darkness of the window, that a tinted window is noncompliant with the 35% light transmission requirement, one easy preliminary step, before proceeding further, is to check the window to see if such a label is present, for if it is and (1) it shows that the window is compliant with the 35% requirement, and (2) there is no reason to suspect that the label is not genuine, any suspicion that arose from the visual observation would likely disappear. In that event, the officer would be obliged to apologize to the motorist and allow him or her to leave without further detention. On the other hand, if there is no label or the label appears not to be genuine, that alone may justify a citation under § 22–101 or § 23–105(a), a repair order, and some further investigation.

Whren stop, the officer must have probable cause, rather than mere reasonable articulable suspicion, to believe that the violation offered as the basis for the stop exists.

Dissenting Opinion by BATTAGLIA, Judge, which HARRELL and CATHELL, Judges, join.

I respectfully dissent.

While I agree with the majority that reasonable articulable suspicion would support a traffic stop as well as a *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) pretextual stop,[1] I disagree that the traffic stop at issue was not supported by a reasonable articulable suspicion.

The evidence adduced at the suppression hearing was that after midnight on May 8, 2006, Deputy Wood, while patrolling Interstate 95 in Harford County, observed Williams' vehicle. Deputy Wood followed Williams' car as Williams proceeded to exit I–95 onto the Route 152 ramp. At the end of the exit ramp, Deputy Wood stopped his police car "10 or 12 feet" behind Williams' car; Deputy Wood described the "well lit" intersection as "almost like daytime" because of the illumination provided by the street lamps. At that point, Deputy Wood noticed that the back window of Williams' car appeared dark, and that he could not see through the rear window into the car:

[STATE]: Did you notice anything about the windows of the vehicle at that time?

[DEPUTY WOOD]: At that time I noticed the back window of the vehicle appeared to be a little darker than normal.

[STATE]: Why did that draw your attention?

[DEPUTY WOOD]: Just based on my training and experience with the Sheriff's Office and traffic stops I've made, I

---

1. From the transcript, it appears that the suppression court did not conclude that the stop itself was pretextual, but found on the basis of public policy that the controlled dangerous substances seized should be suppressed because "any officer is going to say 'Looks a little dark to me,' and pull the vehicle over and search it."

noticed that the vehicle appeared to have tint that wasn't—it appeared to be after-market.

[STATE]: Usually when you observe the vehicle from the rear, in terms of whether you can see through the window, what's been your experience as far as what you can see?

[DEPUTY WOOD]: Due to the fact that that intersection is very well lit, there's multiple street lamps in that area, just due to my training, knowledge, and experience, I've been able to see into the vehicle. At that point in time, I could not.

[STATE]: So normally, in a normal vehicle, you would be able to see through the rear window, is that what you're saying?

[DEPUTY WOOD]: Yes.

[STATE]: So in this case, when you looked at the rear window, could you see through?

[DEPUTY WOOD]: No, I could not.

Deputy Wood also noticed that there were no stickers or labels on Williams' rear window indicating that the window was compliant with Maryland law:[2]

[STATE]: Did you observe any kind of tags or inspection stickers on the window at that time?

[DEPUTY WOOD]: No, I could not.

[STATE]: When you say inspection stickers, are inspection stickers issued for window tinting?

[DEPUTY WOOD]: When a subject is issued a repair order for their window tint and they have it checked out by the State Police and the MVA, a sticker is usually placed on the window saying that, you know, the certification was done or the test was done.

---

**2.** *See State v. Williams*, 401 Md. 676, 692 n. 3, 934 A.2d 38, 48 n. 3 (2007) ("COMAR 11.14.02.14 requires, for post-manufacture tinting, that a label,½ × 1–½ inches, containing, among other things, the percentage of light transmittable, be permanently attached to the window, between the glass and the tinting film or laminate.").

[STATE]: So that normally happens after a repair order is issued?

[DEPUTY WOOD]: Yes.

[STATE]: But you didn't see a sticker on the window at that time?

[DEPUTY WOOD]: No, I did not.

Deputy Wood then stopped Williams' car to issue an equipment repair order for the window tinting and subsequently seized controlled dangerous substances. Based upon the suppression hearing testimony, the circuit court granted Williams' motion to suppress. The majority states because Deputy Wood testified that the window was darker than normal, rather than darker than that allowed by law, that the Deputy's testimony did not establish reasonable articulable suspicion.

Other courts faced with the same testimony that a vehicle's window tinting was dark and the officer could not see into the vehicle found grounds for a stop sufficient to satisfy even a higher standard, that of probable cause. In *United States v. Wallace*, 213 F.3d 1216, 1220 (9th Cir.2000), the United States Court of Appeals for the Ninth Circuit concluded that an officer had probable cause to stop a car based upon his testimony that "[t]he window tinting on the front two windows, even during the daylight hours, was a heavy tint where the occupant inside was at a harder degree to look [sic] into the vehicle." Although the officer misstated the applicable law regarding window tinting and failed to mention the 70 percent light transmission requirement of the California Vehicle Code,[3] the Court ruled that the officer's observations established that

---

**3.** The California Vehicle Code Section 26708(d) (1998), provided in part:

> [A] clear, colorless, and transparent material may be installed, affixed, or applied to the front side windows, located to the immediate left and right of the front seat if the following conditions are met
> * * *
> (2) The window glazing with the material applied meets all requirements of Federal Motor Vehicle Safety Standard No. 205 (49 C.F.R. 571.205), including the specified minimum light transmittance of 70 percent and the abrasion resistance of AS–14 glazing, as specified in that federal standard.

there existed "objective, probable cause to believe that [the] windows were, in fact, in violation." *Id.* at 1220. *See also United States v. Harrell,* 268 F.3d 141, 149 (2d Cir.2001) (stating that police officer's testimony that he could not see into the back of the car because its side and rear windows were tinted provided probable cause to support the traffic stop and noting that despite the officer's testimony that he did not observe a traffic violation, the testimony would have led an objectively reasonable police officer to suspect that the windows were in violation of the law).

Further, in *People v. Hanes,* 60 Cal.App.4th Supp. 6, 72 Cal.Rptr.2d 212 (1997), the court concluded that an officer had reasonable articulable suspicion to stop a black car based upon his testimony that the front right window "was 'so black that it kind of matched the color of the car';" and that "he was unable to see the occupants of the vehicle." *Id.* at 213–14.[4] *See also State v. Wyatt,* 775 So.2d 481, 483 (La.Ct.App.2000) (noting that a traffic stop was justified based upon a police officer's testimony that a car's windows "were tinted so darkly that it was impossible to see inside the car"); *State v. Taylor,* 114 Ohio App.3d 416, 683 N.E.2d 367, 369–70 (1996) (concluding that officer's testimony that window tinting appeared "exceptionally dark," such that he could not see into the vehicle even with the police cruiser headlights shining directly on the vehicle, provided reasonable articulable suspicion to conduct the traffic stop).

Moreover, the majority fails to discuss the fact that Deputy Wood testified at the suppression hearing that he did not see *any* sticker or label on Williams' rear window. The majority recognizes that "COMAR 11.14.02.14 requires, for post-manu-

---

**4.** The California Vehicle Code Section 26708(a) (1996), stated in part that with certain exceptions, "[n]o person shall drive any motor vehicle with any object or material placed, displayed, installed, affixed, or applied upon the windshield or side or rear windows" and that "[n]o person shall drive any motor vehicle with any object or material placed, displayed, installed, affixed, or applied in or upon the vehicle which obstructs or reduces the driver's clear view through the windshield or side windows."

facture tinting, that a label,½ × 1–½ inches, containing, among other things, the percentage of light transmittable, be permanently attached to the window, between the glass and the tinting film or laminate." *State v. Williams,* 401 Md. 676, 692 n. 3, 934 A.2d 38, 48 n. 3 (2007). If an officer does not observe such a label or sticker, that alone could justify a traffic stop. *State v. Williams,* 401 Md. 676, 692 n. 3, 934 A.2d 38, 48 n. 3 (2007). The record in this case only supports the Deputy's testimony that the label was not on the car at the time of the stop: Deputy Wood testified that he did not see any sticker on Williams' rear window at the time of the stop; Williams took the stand and did not offer any testimony regarding the window sticker.

Deputy Wood had reasonable articulable suspicion to justify his traffic stop. By holding as it does, the majority impermissibly restricts the police's ability to conduct a traffic stop based upon tinting violations. I disagree and would reverse the order of the Circuit Court for Harford County.

Judges HARRELL and CATHELL have authorized me to state that they join in the views expressed in this dissenting opinion.