[Cite as *State v. Favors*, 2012-Ohio-3596.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 24921 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2010-CR-3076 |
| v. | : | |
| | : | |
| JOHN FAVORS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 10th day of August, 2012.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHELE D. PHIPPS, Atty. Reg. #0069829, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

RICHARD A. NYSTROM, Atty. Reg. #0040615, 1502 Liberty Tower, 120 West Second Street, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1}   Defendant-appellant John Ideall Favors appeals from his conviction and sentence for Possession of Crack Cocaine.   He contends that the trial court erred by overruling his motion to suppress evidence upon the ground that it was obtained as a result of an unlawful search and seizure, that his conviction is not supported by sufficient evidence, and that his conviction is against the manifest weight of the evidence.

{¶ 2}   We conclude that the trial court did not err in overruling Favors's motion to suppress evidence.   The police officer who stopped Favors observed at least one traffic violation, which provided a basis for a stop.   Favors did not have a valid driver's license, and there were outstanding warrants for his arrest.   He was the sole occupant of the car he was driving, but did not own it.   The police officer was not aware that the owner of the car was present at the scene, and made an authorized decision to tow the car pursuant to the Dayton Police Department's tow policy.   An inventory search conducted prior to the tow led to the disclosure of crack cocaine in the car's center front console.

{¶ 3}   We further conclude that there is sufficient evidence in the record to support Favors's conviction, and his conviction is not against the manifest weight of the evidence.   Accordingly, the judgment of the trial court is Affirmed.

**I.   Favors Is Stopped and Arrested, and the Car He Is Driving Is Towed**

**and Inventoried, Leading to the Discovery of Crack Cocaine**

{¶ 4}   Dayton Police Officer Jacob Rillo was on duty one evening in September 2010, at about 7:30, when he noticed a Ford Taurus being driven by Favors.

Dayton Police Officer Patrick Bucci was with Rillo in their police cruiser. Rillo testified concerning what happened next, as follows:

A. He [Favors] was eastbound on Tampa Avenue and we were behind him. And we observed him make a hasty and somewhat awkward turn from the travel portion of the roadway to the curb without signaling. And while doing so, he also ran up onto the curb with the car.

Q. All right. And was he alone in the car?

A. Yes, he was.

Q. Okay. And did you see – strike that. Is failing to signal to the curb a violation of the law?

A. Yes, it is.

Q. And what about running up on the curb you said?

A. It's also a violation.

Q. What did you decide to do at that point?

A. We initiated a traffic stop on the individual.

Q. How did you proceed?

A. We activated our overhead lights and approached the car where I saw the Defendant as the driver. As I was walking up, I saw him turn his body like he was going to look into the back seat and saw his left shoulder dip down towards the center console area.

As I approached closer to the car and got to the window he was turning back around to face forward and I saw his hands in his lap. And he reached up to turn

off the car and started to open the door as I was getting to the door.

Q. Uh-huh. And you approached him on which side, on the driver's side door?

A. Yes, ma'am.

Q. Okay. And what happened when you approached him on the driver's side door?

A. Since he was already starting to get out of the car I just went ahead and let him continue to get out. And I asked him if he had any ID on him and he said no. And the manner with which he exited the car so quickly, I was concerned that there was something else going on other than just a simple traffic stop.

Q. Uh-huh.

A. So I elected to pat him down for my safety and then I put him in the backseat of my car to ascertain his identity.

Q. You put him in the back of the cruiser –

A. Yes, ma'am.

Q. – at that point? Okay. And is there just one cruiser at that point?

A. Yes.

Q. Or the whole time –

A. The whole time.

Q. – there was one cruiser. All right. And did you obtain identification on the Defendant?

A. He was able to provide us with his name and social security number.

* * *

Q. Did you run his name and social security number through your system?

A. Yes, his name was run over our in[-]car computer where we learned that he did not have a valid driver's license, and in addition, he had two warrants for his arrest in the City of Dayton.

Q. What did you decide to do based on that information?

A. He was under arrest.

Q. What did you do after you decided to place him under arrest for those warrants and the violation of driving without a license?

A. We began writing him citations for the traffic violations and we called for a tow truck.

Q. And why would you call for a tow truck?

A. It's the City of Dayton policy when a driver is arrested out of a vehicle and/or they don't have a valid license, it's preferred that the car be towed whether it's on a public street or a private property. We do have the option to release the car to the registered owner if the registered owner is on scene.

Q. Who was the car registered to?

A. Gladys Hill.

Q. Was Gladys Hill on scene?

A. Not to my knowledge.

Q. Do you know who that person is in relation to the Defendant?

A. I do not.

Q. Were you able to ask him about that?

A. No.

Q. Why not?

A. After we got his name and social security number and informed he [sic] was under arrest, he became very irate. He was angry and belligerent. He cursed at us almost continuously. And I couldn't get a word in edgewise.

Q. Are you saying then you were unable to speak with him about the situation?

A. Correct, I couldn't. I was trying to ask questions, but he was just – he was so mad he was just yelling at us.

Q. Was this before you completed the inventory search of the car?

A. It was before, during, and after.

* * *

Q. Now when you completed this inventory search prior to the tow, what did you find in the car?

A. While conducting the inventory, in the center console where I saw him dip his left shoulder as I made my initial approach, I found a clear plastic baggie contained [sic] two rocks of what I believed to be crack cocaine. In addition, I found a piece of mail in his name in the glove box and receipts for service done to the car in his name.

* * *

Q. When the tow truck was towing the car or preparing it to be towed did the Defendant make any statements?

A.   Yes.

Q.   What were those that you recall?

A.   He said, "That's my shit.   That's my car," you know, talking to the tow truck driver or yelling at him.

*  *  *

Q.   Officer Rillo, is it your testimony then that you gave instructions to this Defendant to be quiet?

A.   Yes.

Q.   Is it your testimony then that he did not follow your instructions to be quiet?

A.   Correct.

Q.   Did the Defendant's inability to follow your instructions hinder your ability to find out information about Gladys Hill or any other person who could take possessory interest of the car?

A.   Correct.

{¶ 5}   Favors also testified at the suppression hearing.   He contradicted Officer Rillo's account in many respects.   But he did admit to having "shouted something along the lines of, 'Hey, that's my car.   That's my shit.' "

## II.   The Course of Proceedings

{¶ 6}   Favors was arrested and was subsequently charged by indictment with one count of Possession of Crack Cocaine in an amount less than one gram, in violation of R.C. 2925.11(A), a felony of the fifth degree.   He moved to suppress the evidence,

contending that it was obtained as the result of an unlawful search and seizure.

{¶ 7} At the suppression hearing, Officer Rillo testified on behalf of the State, and Favors testified on his own behalf. The tow policy of the Dayton Police Department was admitted in evidence.

{¶ 8} In a written decision overruling the motion to suppress, the trial court found that Favors did not contest that he had committed at least two traffic violations, so that there was lawful basis for Officer Rillo to stop Favors. The trial court found that the decision to tow the vehicle was both reasonable under the circumstances, and in accordance with the tow policy of the Dayton Police Department, in view of the fact that the sole occupant of the car was being arrested. The trial court rejected Favors's argument that with a "moderate" investigation, Rillo could have ascertained that it was not necessary to have the car towed for safe-keeping purposes. In this regard, the trial court reasoned as follows:

A critical fact here is the Officer's ability to talk to the Defendant. The Officer says the Defendant was essentially incommunicado with them because he got on his phone right away and then became irate. Defendant argues that he did not become agitated until after the Officer decided to have the vehicle towed. Review of the evidence indicates that the Officer is more credible. The fact is that once Officer Rillo placed Defendant in the backseat of the cruiser Defendant started talking on his (Defendant's) cell phone. The Officer was not really able to speak with the Defendant because the Defendant was talking to someone else. The Defendant was complaining about the stop and was attempting to get assistance since he was being arrested.

The court finds that the Officer is credible about the Defendant becoming boisterous, irate and upset. That mental state of the Defendant combined with his attention to others by virtue of the cell phone made it very difficult for the Officer to talk with him about some other safe disposition of the grey Ford Taurus. It was not unreasonable for the Officer to decide to tow the vehicle when the Defendant ignored the Officer by engaging in a call with someone else and then later becoming verbally hostile. Because of the two different types of somewhat offensive conduct increasing in degree, the channel for communication was broken.

**{¶ 9}** At a jury trial, Officer Rillo and Jennifer Watson, a forensic chemist, testified on behalf of the State. Favors and his uncle, Michael Favors, testified for the defense. The jury found Favors guilty as charged.

**{¶ 10}** Favors was sentenced to community control sanctions for a period not to exceed five years, and his driver's license was suspended for six months. From his conviction and sentence, Favors appeals.

### III. The Search of the Car Favors Was Driving, Leading to the Discovery of Crack Cocaine, Was a Reasonable Inventory Search in Accordance with the Tow Policy of the Dayton Police Department

**{¶ 11}** Favors's First Assignment of Error is as follows:

WHETHER THE TRIAL COURT ERRED IN FAILING TO SUPPRESS THE FRUIT OF A WARRANTLESS SEARCH AND THEREBY PRECLUDED DEFENDANT'S CONSTITUTIONAL RIGHTS TO UNREASONABLE SEARCHES AND DUE PROCESS

UNDER THE *FOURTH, FIFTH,* AND *FOURTEENTH AMENDMENTS* OF THE *UNITED STATES CONSTITUTION* AND *ARTICLE I, SECTION 10,* OF THE *OHIO STATE CONSTITUTION*. (Italics in original.)

{¶ 12} Favors cites *State v. Myrick*, 2d Dist. Montgomery No. 21287, 2006-Ohio-580, for the proposition that in order to impound a vehicle, "[t]here must be some good reason like criminal evidence, obstructing traffic, or some other necessary public purpose." In that case, we cited *State v. Taylor*, 114 Ohio App.3d 416, 683 N.E.2d 367 (2d Dist. 1996), for the proposition that: "A car may be impounded if it is evidence in a criminal case, used to commit a crime, obtained with funds derived from criminal activities, or unlawfully parked or obstructing traffic; or if the *occupant* of the vehicle is arrested; or when impoundment is otherwise authorized by statute or municipal ordinance." (Emphasis in *State v. Myrick*.)

{¶ 13} In *State v. Myrick*, the person arrested was not an occupant of the vehicle towed and impounded; in the case before us, Favors, the person arrested, was the sole occupant of the vehicle being towed. *Myrick*, ¶ 26.

{¶ 14} Furthermore, in *Myrick* the State had failed to demonstrate that the police department involved in that case "maintained a standardized routine tow policy based on a discernible set of criteria." *Id.*, ¶ 27. In the case before us, the tow policy of the Dayton Police Department was admitted in evidence. That policy provides, in pertinent part:

**I**. **WHEN TO TOW A VEHICLE** ( * * * )

A. <u>Driver/Owner Arrested</u>: Vehicles <u>operated</u> by drivers without an operator's license, while under suspension, operating while under the influence or where the vehicle was used in the commission of a crime should preferably be towed from where they were stopped,

including private property. If an officer elects not to tow the vehicle and leave it legally parked, a Tow-In/ Liability Waiver (Form F-472) must be completed by the operator/registered owner of the vehicle.

1. If the driver is the registered owner or the registered owner is on the scene and gives permission to another properly licensed driver to drive their vehicle, the officer may release the vehicle rather than tow it.

2. If the vehicle is towed, officers should make reasonable efforts to assure that the driver and other occupants are dropped off at a safe location until legal transportation can be obtained.

3. RCGO [Dayton Revised Code of General Ordinances] 76.08 describes circumstances, which allow a vehicle to be impounded due to an arrest. It states, in part, *"Members of the Police Department are authorized to remove or direct the removal of a vehicle under any of the following circumstances ... (C) Arrest and detention of driver. Whenever the driver or person in charge of any vehicle is placed under arrest and taken into custody and detained by police under circumstances which leaves or will leave a vehicle unattended."* (Boldface, underlining, and italics in original.)

{¶ 15} In *Myrick*, we noted that although the police officer in that case claimed that a written tow policy existed, he did not articulate a standardized policy, a standardized policy was never offered in evidence, and the officer's testimony indicated that a decision whether to tow and impound a vehicle was "based on the whim of the arresting officer." *Id.*, ¶ 23. By contrast, in the case before us, a standardized, routine tow policy was admitted in evidence. Although that policy leaves some discretion to the officer on the scene, it establishes a

discernible set of criteria upon which to base that discretion. Furthermore, paragraph I(A)(1) of the policy implies that unless a registered owner on the scene is either going to be the driver of the vehicle, or gives permission to another properly licensed driver to drive the vehicle, the officer may not release the vehicle rather than tow it; i.e, there is no discretion not to tow the vehicle unless that circumstance obtains. The trial court found, and there is evidence in the record of the suppression hearing to support that finding, that Favors, by refusing to quiet down sufficiently for Officer Rillo to talk to him, effectively prevented Officer Rillo from ascertaining whether Gladys Hill, the registered owner of the vehicle, was present on the scene.

{¶ 16} Favors contends in his brief that despite the tow policy, Rillo testified at the suppression hearing that he had discretion to tow or not to tow. Favors cites this portion of Rillo's testimony in support of that proposition:

> Q. You said that upon making a decision that the Defendant was going to be under arrest you immediately decided to tow the car. Did you consider at all your options to not tow the car?
>
> A. Yes.
>
> Q. And why did you reject the options that you had to tow [sic] the car?
>
> A. Per policy, if the registered owner is there or is able to be reached, we can elect to release the car to the registered owner. The registered owner was not there and to my knowledge was not able to be contacted.

{¶ 17} We do not see how the cited portion of Rillo's testimony supports Favors's argument.

Rillo testified that he would only have discretion, under the tow policy, not to tow the car if the registered owner could be reached, but the registered owner was not able to be contacted, and so Rillo had no discretion under the policy.

{¶ 18} Favors next argues that there are contradictions between Officer Rillo's testimony at the suppression hearing and his testimony at the trial, as a result of which the trial court's decision not to suppress the evidence is not supported by competent, credible evidence. As noted in Part IV of this opinion, below, we do not find contradictions between Officer Rillo's suppression and trial testimony. Even if there were, however, error in the trial court's ruling on a motion to suppress must be predicated upon the record before the trial court at the time of the ruling, which, at the time of the ruling, only included the suppression hearing, not the trial.

{¶ 19} Favors cites *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, for the proposition that additional facts elicited at trial can be considered in reviewing the propriety of a suppression ruling on appeal. We find nothing in that opinion to suggest that appellate review of a suppression decision can be based upon anything other than the record of the suppression hearing. Likewise, Favors cites *State v. Lemmons*, 5th Dist. Delaware No. 10-CA-48, 2011-Ohio-3322, but again, we find nothing in that opinion, which was not concerned with a suppression ruling or hearing, to support his contention.

{¶ 20} Finally, at the oral argument of this appeal, Favors argued that even if Officer Rillo could properly conduct an inventory search of the car, he had no authority, as part of the inventory search, to look inside a closed container. Favors contends that the center console was a closed container.

{¶ 21} It is not clear from the record whether the center console was, in fact, closed.

Assuming that it was closed, we conclude that Officer Rillo could properly look inside it as part of the inventory search. "If, during a valid inventory search of a lawfully impounded vehicle, a law-enforcement official discovers a closed container, the container may only be opened as part of the inventory process if there is in existence a standardized policy or practice specifically governing the opening of such containers." *State v. Hathman*, 65 Ohio St.3d 403, 1992-Ohio-63, 604 N.E.2d 743, paragraph two of the syllabus.

{¶ 22} The Dayton Police Department Tow Policy, which was admitted in evidence, provides at IV(B)(1), in pertinent part, as follows: "B. <u>Inventory of a Towed Vehicle – Arrest Situation</u> * * * 1. Inventory property inside the vehicle's passenger compartment, glove box, *console*, and trunk prior to towing. * * * " (Italics added.) Thus, the Tow Policy specifically provides for inventorying property inside a console, and Officer Rillo therefore properly looked inside the console, even assuming it was closed, under *Hathman*.

{¶ 23} Favors's First Assignment of Error is overruled.

**IV. The Evidence in the Record Is Sufficient to Support Favors's Conviction, and his Conviction Is Not Against the Manifest Weight of the Evidence**

{¶ 24} In support of this assignment of error, Favors relies upon his assertion that Officer Rillo contradicted his testimony at the suppression hearing when he testified at trial. This assertion is predicated upon Favors's argument, in his brief, that: "At trial, the officer admitted he was traveling on Trishman prior to turning onto Tampa when Defendant parked his car on Tampa." Thus, according to Favors, Officer Rillo could neither have seen the traffic violations upon which the stop was based, or the "dip of the left shoulder [by Favors]"

suggesting that Favors was then putting the crack cocaine in the center console where it was later found.

{¶ 25}   We reject the predicate for this argument.   Favors cites the following portion of Rillo's trial testimony:

> Q.   Okay.   And your cruiser before it turned onto Tampa, which street was it on?
>
> A.   We were coming up Trishman.
>
> Q.   Okay.   So –
>
> A.   Going north.
>
> Q.   Trishman's this one over here?
>
> A.   Yes, sir.
>
> Q.   And going north.   So you made a right turn onto Tampa then?
>
> A.   Yes, sir, behind the suspect vehicle.

{¶ 26}   We see nothing contradictory in this testimony.   Both at the suppression hearing and at the trial, Officer Rillo testified that he was on Tampa, behind the Ford Taurus Favors was driving, when he saw Favors commit traffic violations.   Until the testimony quoted above, Rillo never testified what street he was on before he turned onto Tampa, nor did he otherwise deny that he was on Trishman before he turned onto Tampa.   *Favors* testified that Rillo's cruiser was not on Tampa when Favors parked, but Rillo disputed this:

> Q.   And you heard him [Favors] testify about your cruiser coming from a great distance and squealing to a stop next to his car, do you recall him saying that?
>
> A.   Yes, ma'am.

Q. Was that accurate?

A. It's wildly inaccurate.

{¶ 27} It is questionable whether prior inconsistent testimony at a suppression hearing can be considered on an appellate weight-of-the-evidence review of a jury verdict unless the prior inconsistent testimony is used at the trial to impeach the witness, since the finder of fact, whose verdict is being reviewed, will not otherwise have been aware of the prior inconsistent testimony. If prior inconsistent testimony at the suppression hearing could be used, there is a clear contradiction between *Favors's* testimony at the suppression hearing and his testimony at the trial. At the suppression hearing, he admitted having shouted to the tow operator: "Hey, that's my car. That's my shit." At trial, he specifically denied having made that statement.

{¶ 28} In any event, we see no contradictions in Officer Rillo's testimony that are of such magnitude that a reasonable juror could not have credited his testimony. Therefore, we conclude that the judgment is not against the manifest weight of the evidence. The judgment is certainly supported by sufficient evidence. Favors's statement, "that's my shit," supports an inference that he was referring to the crack cocaine in the center console. The mail in the glove compartment addressed to him, and especially the car repair receipt made out to him, suggests that he had been using the car with enough regularity to support an inference that the crack cocaine in the center console belonged to him.

{¶ 29} Favors's Second Assignment of Error is overruled.

## V. Conclusion

{¶ 30}   Both of Favors's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

DONOVAN and FROELICH, JJ., concur.

Copies mailed to:

Mathias H. Heck
Michele D. Phipps
Richard A. Nystrom
Hon. Timothy N. O'Connell