[Cite as *State v. Valdez*, 2017-Ohio-241.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,             CASE NO. 9-16-01

    v.

JOSE VALDEZ, JR.,                     O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 15-CR-0338

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision:    January 23, 2017

APPEARANCES:

    *John P.M. Rutan* for Appellant

    *Kevin P. Collins* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Jose Valdez, Jr., appeals the judgment of the Court of Common Pleas of Marion County convicting him of one count of trafficking in cocaine, one count of trafficking in heroin with a forfeiture specification, and sentencing him to eight years in prison. On appeal, Valdez argues that the trial court erred by (1) denying his motion to suppress; (2) abusing its discretion in the way that it handled Crim.R. 16 violations committed by the State; (3) failing to exclude the fruits of a July 9, 2015 search; (4) entering a verdict that was not supported by sufficient evidence; and (5) entering a verdict that was against the manifest weight of the evidence. For the reasons that follow, we affirm, in part, and reverse, in part, the judgment of the trial court, and remand for further proceedings.

{¶2} On July 23, 2015, a felony complaint was filed in the Marion County Municipal Court charging Valdez with one count of trafficking in cocaine in violation of R.C. 2925.03(A)(1), (C)(4), a felony of the third degree; one count of trafficking in cocaine in violation of R.C. 2925.03(A)(1), (C)(4), a felony of the first degree; and one count of trafficking in heroin in violation of R.C. 2925.03(A)(1), (C)(6), a felony of the third degree.

{¶3} On July 30, 2015, the Marion County Grand Jury returned a three-count indictment against Valdez charging him with one count of trafficking in cocaine

with a forfeiture specification in violation of R.C. 2925.03(A)(1), (C)(4), 2941.1417, a felony of the third degree; one count of trafficking in cocaine with a forfeiture specification in violation of R.C. 2925.03(A)(1), (C)(4), 2941.1417, a felony of the first degree; and one count of trafficking in heroin with a forfeiture specification in violation of R.C. 2925.03(A)(1), (C)(6), 2941.1417, a felony of the third degree. The case was transferred to the Court of Common Pleas of Marion County the next day. Later, Valdez entered pleas of not guilty to each charge.

{¶4} On August 6, 2015, Valdez filed a demand for discovery.

{¶5} The State responded to Valdez's discovery demand on August 14, 2015. Among other pieces of information, the State gave defense counsel the confidential informant ("CI") agreement and identified "CI 15-13" as a potential witness. The State included that CI 15-13 had a misdemeanor conviction for possession of marihuana.

{¶6} On August 28, 2015, the State filed supplemental discovery consisting of Valdez's prior criminal record and lab results from the Bureau of Criminal Investigation ("BCI").

{¶7} On September 10, 2015, Valdez filed a motion to suppress any evidence obtained from two separate warrantless "searches" that occurred on April 28, 2015 and May 5, 2015. Valdez argued that police needed a warrant to send a CI equipped with audio/video equipment into Valdez's home when the purpose of the visit was

to conduct a sale of illegal drugs. Valdez asked that all evidence taken, including the audio and video recordings, from both dates be suppressed.

{¶8} The State filed a motion to strike Valdez's motion to suppress or for a more definite motion to suppress on September 30, 2015.

{¶9} A hearing date was set for Valdez's motion, and the State subpoenaed three potential witnesses: Lieutenant Christopher Atkins, Detective Andrew Isom, and Detective Matthew Baldridge.

{¶10} The suppression hearing occurred on October 14, 2015. At the onset of the hearing, the court denied the State's motion to strike.

{¶11} Detective Matthew Baldridge of the Marion Police Department was the sole witness to testify on behalf of the State. Detective Baldridge testified that he was assigned to the MARMET Drug Task Force and that the team had been investigating Valdez for a while regarding his alleged sales of cocaine and heroin. He stated that he first became involved towards late April 2015. Detective Baldridge explained that they decided to set up a controlled buy of drugs using a CI. He added that each CI is approved by both MARMET and the Prosecutor's office. He testified that each CI signs a contract with the task force and that they will perform the buys in exchange for either money or working off their own criminal charges.

**{¶12}** Detective Baldridge stated that he received a call from a CI on April 28, 2015. He explained that the CI told him that the CI could purchase a half of an ounce of cocaine from Valdez for approximately $550.00. He said that he and another officer, Detective Isom, met with the CI, searched the CI, placed audio/video recording equipment on the CI, and gave the CI the money to buy the drugs. He added that the buys occurred at 142 North Grand in Marion. Detective Baldridge testified that Valdez lived at 142 North Grand.

**{¶13}** As Detective Baldridge was discussing how a controlled buy works, the court interrupted, "Okay. Why do we care? I mean, the issue is how the C.I. got into the house, isn't it? Whether he got in by consent or not? I mean - -[.]" Oct. 14, 2015 Hrg., p. 11.

**{¶14}** Thereafter, the State played the audio/video recording of the controlled buy that occurred on April 28, 2015. In the video, the CI can be seen walking into the house without knocking or being let in by anyone, including Valdez. Detective Baldridge explained that the buy was set up via text messages between the CI and Valdez. He added that when he searched the CI after the buy was conducted the CI had a half of an ounce of cocaine. He testified that the CI went to Valdez's house with the purpose of buying cocaine from Valdez.

**{¶15}** Detective Baldridge stated that another controlled buy occurred on May 4, 2015. He could not initially remember how this buy was arranged, but

recalled later that it was set up via text messages between the CI and Valdez. He added that the CI was to purchase an ounce of cocaine for $1,200.

{¶16} Thereafter, the State played the audio/video recording of the controlled buy that occurred on May 4, 2015. In the video, the CI can be seen knocking on the front door, being greeted by Valdez, and then let into the house by Valdez. The recording did not show any drugs. Additionally, a third individual was present in the room while the alleged transaction occurred.

{¶17} On cross-examination, Detective Baldridge admitted that he did not possess any phone call recordings involving the CI and Valdez regarding any sales of cocaine. He believed that he possessed copies of the text messages, but did not bring them to the hearing.

{¶18} After Detective Baldridge finished testifying, both parties indicated that they did not have any other evidence to present. At this time, the court asked the State what its theory was as to avoid the search warrant requirement. The State argued that consent was present in both buys. The court asked the State if it wished to present additional evidence as to consent, and the State indicated that it would like to call the CI to testify. Defense counsel objected, but the court initially allowed the State to reopen its case.

{¶19} A brief recess was taken while the State could get the CI to the hearing.

{¶20} The State called the CI, Sam Campbell, to testify on its behalf. Defense counsel objected, arguing that the State had failed to disclose Campbell as a witness, which was a violation of Crim.R. 16. The prosecutor admitted that she never disclosed the CI's name to defense counsel because Valdez had a history of antagonizing other CIs in the past. She further admitted that she unintentionally misrepresented to the court and defense counsel that she would disclose the name of the CI to defense counsel as indicated in the State's initial response for discovery.

{¶21} After both sides were given an opportunity to argue further, the court stated that its initial decision had been to let the CI testify. However, given that the State failed to disclose the CI as a witness, the court excluded the CI from testifying at the hearing. The court continued, "I'm not excluding that witness from testifying at trial. The witness has now been disclosed to thee [sic] defense." *Id.* at p. 35. The court also found that the State had disclosed the CI's criminal record and the CI Operative Agreement.

{¶22} Regarding the May 4th controlled buy, the court noted that "the consents [sic] pretty clear. I mean, he knocks on the door, the door's answered, he's let in, et cetera." *Id.* at p. 48.

{¶23} The court granted defense counsel's request to provide a written supplemental argument in favor of the motion to suppress given the State's late

filing of supplemental authority just prior to the hearing. The court also continued the trial date.

**{¶24}** On October 20, 2015, the State filed its supplemental memorandum contra to Valdez's motion to suppress.

**{¶25}** On October 23, 2015, Valdez filed his supplemental argument in support of his motion to suppress.

**{¶26}** The court issued its decision on Valdez's motion to suppress on October 26, 2015. The court noted that "the Prosecutor had intentionally withheld the identity of the [CI] from the Defense, even though the formal discovery filed by the State indicated that the State would disclose the [CI's] identity." (Docket No. 60, p. 2). The court found that the controlled buys, in this particular case, constituted searches under the Fourth Amendment of the United States Constitution, and that a warrant was never acquired. However, the court found that the consent exception applied to the May 4th entry into the home. Specifically, it found, "With regard to the May 4 entry into the home, the evidence is clear that consent was given. The operative knocked on the door, it was answered, and he was let in, all as can be seen by the video evidence (State's Ex. 3)." (*Id.* at p. 4). Regarding the April 28th entry, the court found that the State had failed to prove consent. The court found that the CI walked into the home without knocking and no evidence was presented as to whether the CI was invited into the home.

**{¶27}** The court concluded that Valdez's motion to suppress was granted as to the April 28th entry, but denied as to the May 4th entry. Thus, the court excluded "the video, the testimony of the operative, or any drugs purchased while in the residence" from the - April search. (*Id.* at p. 6).

**{¶28}** The State filed supplemental discovery on October 27, 2015, consisting of a copy of text messages.

**{¶29}** On November 6, 2015, the State filed supplemental discovery, consisting of a DVD containing photos of text messages on Valdez's phone and named Detective David Troutman of the Marion Police Department as a potential witness.

**{¶30}** On November 17, 2015, the State filed supplemental discovery, consisting of three potential witnesses: Kathy Caudill of the Marion Police Department; Lieutenant Mark Beaschler of the Marion Police Department; and Detective Ben Graff of the Marion Police Department.

**{¶31}** The matter proceeded to a two-day jury trial on November 19 and November 20, 2015. Prior to trial, the State moved to dismiss Count I of the indictment (Trafficking in Cocaine), including the specification, which was granted by the court. Next, Valdez changed his plea to guilty as to Count III (Trafficking in Heroin). He also pled no contest to the forfeiture specification attached to that count. The court, after engaging in a colloquy with Valdez, accepted his plea and

found Valdez guilty. Thus, the jury trial went ahead only on Count II (Trafficking in Cocaine).

{¶32} After the jury was impaneled, but before opening statements, defense counsel objected to the State's intention to call its first witness, Chris Adkins of the Marion Police Department. Defense counsel argued that the State failed to disclose Adkins as a witness until the eve of trial. After hearing the prosecutor's excuse for failing to disclose, the court indicated that it was "kind of concerned that we have a witness that wasn't disclosed at all and now he turns out to be [the State's] very first witness." Trial Tr. Vol. I, p. 186. The court concluded that this was a clear discovery violation, but it indicated that it had not decided on the proper remedy.

{¶33} Defense counsel hinted that the State had failed to disclose other witnesses, which the State denied initially. Then, the prosecutor admitted that she did not disclose Kathy Caudill and Detective Ben Graff until the eve of trial. The court noted that these failures to disclose would be discovery violations, but again decided to wait before choosing a remedy.

{¶34} Detective Colin Lowe of the Marion County Sheriff's Office was the first witness to testify. Detective Lowe testified that he was assigned to MARMET and explained how CI's were used during controlled buys to purchase narcotics from suspected drug dealers.

{¶35} Detective Lowe stated that he joined a drug investigation regarding Valdez in mid-April 2015. He added that he was conducting surveillance of 142 Grand Street in Marion on May 4, 2015. He testified that he watched a CI enter the house and leave approximately four minutes later. He also observed Valdez and an unidentifiable black male exit the house a few minutes later and enter a silver car. He clarified that he could not see the CI actually enter into the house, but was able to see the CI approach the door.

{¶36} Detective Lowe was ordered to tail the car and followed it until other officers picked up the chase. He explained that he then traveled to a residence on Chestnut where it was suspected that Valdez was conducting more drug sales. While conducting surveillance of this property, Detective Lowe testified that the silver car, containing Valdez and the black male, passed his location and the two men exited the car and entered the house.

{¶37} The prosecutor began to ask Detective Lowe about an incident on July 9, 2015, when defense counsel objected and requested a sidebar discussion. During the sidebar, defense counsel argued that any evidence or testimony regarding a search that occurred two months after the alleged drug sale in this case was unduly prejudicial and should be excluded. The prosecutor explained that Detective Lowe would testify that Valdez made a statement that money obtained from the July search was from illegal drug proceeds. The court agreed that this testimony was

clearly prejudicial, but allowed the testimony finding that the testimony was relevant, material, and not unduly prejudicial.

**{¶38}** Detective Lowe testified that he took part in a search, procured by warrant, of 142 Grand Street on July 9, 2015. After conducting the search, Detective Lowe explained that he met with Valdez to serve him a "seizure forfeiture notice" for approximately $11,000 that was found in the house. He added that Valdez told him that Valdez did not have a job and that the money was from drug sales.

**{¶39}** On cross-examination, Detective Lowe admitted that there was nothing in his police report from the controlled buy that stated Valdez admitted the $11,000 were drug proceeds. He clarified that the report did not contain any information from the July search. Detective Lowe identified a copy of the "seizure forfeiture notice," which was signed by Valdez and which contained the following written statement by one of the officers, "no job, admitted drug money." *Id.* at p. 227.

**{¶40}** Detective Lowe testified that he did not find any cocaine during the July search. Further, none of the buy money from the May 4, 2015 controlled buy was found.

**{¶41}** On re-direct-examination, Detective Lowe explained that everything is filled out on the "seizure forfeiture notice" before the person signs it. Therefore,

he stated that Valdez signed the document after the incriminating statement was written.

**{¶42}** Detective Troutman of the Marion Police Department was the next witness to testify. After Detective Troutman introduced himself, defense counsel objected to his testimony. Another sidebar was held, and defense counsel argued that Detective Troutman was never disclosed. The prosecutor argued that she disclosed Detective Troutman as a witness on November 6, 2015, approximately two weeks before trial. The court was concerned that the State had not disclosed this witness earlier, but allowed the witness to testify, in part because it found that "[the testimony] doesn't sound like [it] is anything that earth shaking[.]" *Id.* at p. 244. Then, direct-examination resumed.

**{¶43}** Detective Troutman testified that he was assigned to the MARMET drug task force and was asked to download a video recording taken from a controlled buy that occurred on May 4, 2015, involving Valdez, onto a DVD. He identified the DVD, which was later admitted into evidence.

**{¶44}** Detective Troutman stated that he was also involved in a search of 142 Grand Street on July 9, 2015. He explained that his duty was to take photographs of the location and any evidence. Detective Troutman was handed 14 photographs by the prosecutor, when defense counsel requested a sidebar.

**{¶45}** During the sidebar, defense counsel objected to the photographs being admitted because they were unduly prejudicial and not relevant. The jury was dismissed so that the parties and the court could discuss the photographs in more detail.

**{¶46}** The court found that the photographs were clearly relevant and that they constituted Evid.R. 404(B) evidence. The court determined that each photograph should be examined to determine admissibility rather than looking at the photographs as a whole.

**{¶47}** At this time, defense counsel moved for a mistrial arguing that Valdez had been prejudiced by the admission of any evidence from the July search. He argued that there was no link from the May 4, 2015 drug buy to the July search.

**{¶48}** The court indicated that an analysis under Evid.R. 401, 403, and 404 were required. The court found that Evid.R. 401 was easily met because the evidence was relevant in the court's mind. The court also granted defense counsel's request for a continuing objection regarding anything from the July search.

**{¶49}** The parties and the court then went through each photograph. The first photograph depicted the kitchen, which is where the State argued the May 4, 2015 controlled buy took place. The second photograph depicted a police scanner. The third photograph was of the back door, which was boarded up. The fourth photograph was of cash, approximately $11,000. The fifth photograph was a closer

shot of the $11,000. The sixth photograph depicted a cell phone and a separate amount of cash totaling $262. The seventh photograph depicted razor blades and an attorney's business card. The eighth photograph showed wadded up plastic bags. The ninth photograph was of a plastic bag. The tenth photograph depicted a bunch of rubber bands. The final four photographs depicted what the State believed to be a ledger. Defense counsel renewed his objection, and argued, in part, "there's nothing on there that that [sic] indicates that Sam or whoever was involved." *Id.* at p. 266. After consideration, the court excluded the seventh photograph and one of the ledger photographs.

{¶50} After direct-examination resumed, Detective Troutman identified each photograph, which were published for the jury. Defense counsel renewed his objection, which was noted by the court. Detective Troutman testified that people own police scanners so that they can listen to police radio traffic. He explained that the $11,000 was found in a sock drawer. He added that the ledgers were used to show who owed the writer money and how much money they owed.

{¶51} Sam Campbell, the CI, was the next witness to testify on behalf of the State. Prior to Campbell's testimony, defense counsel objected to his testimony based on the State's failure to properly disclose Campbell as a witness. Specifically, defense counsel claimed that the State failed to provide the spelling of Campbell's first and last name and failed to provide an address. The court continuously asked

defense counsel why he did not request this information, but defense counsel argued that he did not have to ask for it and that the duty was on the State to disclose the information.

{¶52} Campbell testified that Valdez was a family friend and that he calls Valdez "Bubb." He explained that he became involved with MARMET after he was caught with ecstasy. He added that he signed a three-page operative agreement, which detailed what Campbell had to do and what he would receive if he complied. He testified that he worked primarily with Detective Baldridge.

{¶53} Campbell stated that he took part in a controlled buy for cocaine on May 4, 2015. He explained that he sent Valdez text messages and might have called him too. Campbell identified a photograph depicting text messages sent between him and Valdez. Campbell indicated that he initiated the conversation and asked if he could get a "zip" of "soft." Campbell explained that "zip" meant an ounce and "soft" meant cocaine. He added that Valdez sent a text saying "1200." *Id.* at p. 304.

{¶54} Campbell testified that he met up with Detective Baldridge after texting Valdez and that he was given $1,200 and equipped with a video/audio recording device after being searched by the detective.

{¶55} He stated that he went to Valdez's house, exchanged the money for the cocaine, and met back up with MARMET. He believed the transaction occurred at 142 Grand Street.

{¶56} Campbell explained that there was one other person inside the house other than Valdez, a black male. He claimed that he did not really talk with the other individual much. He added that he and Valdez talked about drugs, money, and other things. He affirmed that Valdez was the one who gave him the drugs.

{¶57} Campbell identified the DVD containing the video/audio footage from the May 4, 2015 controlled buy, which was played for the jury and later admitted into evidence. Campbell explained that, in the video, Valdez was saying that he gave Campbell two extra grams of cocaine and he wanted so much money for it.

{¶58} On cross-examination, Campbell admitted that he was caught with about six grams of ecstasy on his person on April 23, 2015. He clarified that he was working off the potential charges from that date when he did the controlled buy on May 4, 2015. Campbell testified that he was unable to show the drugs on camera because they were tucked underneath his testicles.

{¶59} Campbell testified that an ounce of cocaine was an amount that was not typically for individual use and that he would sell drugs if someone had the money. He admitted that he has used heroin and other drugs in the past, but was clean at trial.

{¶60} Campbell stated that he was pulled over by police on April 23, 2015, searched, and the police found the drugs. He added that he was not arrested at that time. Rather, he explained that the police officer gave him a business card and asked

him if he wanted the charges to go away. Campbell indicated that he declined the officer's offer, but later called the detective listed on the business card.

{¶61} Campbell testified that he met Detective Baldridge and another officer at a quarry to discuss the possibility of becoming a CI. He stated that the officers were taking notes during this meeting and that the meeting was not recorded.

{¶62} Campbell explained that he has also called Valdez "Tio." He added that he could not remember anything other than the controlled buy that occurred on May 4, 2015. He admitted that he used to buy drugs with Valdez's uncle and that they all associated with drugs.

{¶63} After these statements, the jury was excused while the parties discussed Campbell's testimony and whether he needed to be advised of his Fifth Amendment rights. During this time, defense counsel renewed his objection regarding Campbell's testimony and the video from the controlled buy. The court overruled his objections and denied defense counsel's earlier request for a mistrial.

{¶64} Defense counsel continued to argue the prejudice resulting from the State's failure to disclose a police report from the meeting at the quarry. The prosecutor denied that a report of any kind existed. Rather, the prosecutor argued that the statement in the operative agreement was sufficient. It stated, "Drop any and all charges related to the incident on 4-23-15 where [Campbell] was found in possession of drugs." *Id.* at p. 351. The court found this to be very vague and

reminded the prosecutor that defense counsel was entitled to all discovery prior to trial.

**{¶65}** Because the parties were still arguing about the discovery violations, the court decided to dismiss the jury for the day.

**{¶66}** Once the jury was dismissed, the court ordered the prosecutor to disclose all information regarding the CI's April 23, 2015 incident and the meeting at the quarry. Regarding the quarry meeting, Detective Baldridge stated, "Yeah. I'm sure we took notes." *Id.* at p. 359. Defense counsel proceeded to argue about why the notes were not preserved given his motion to preserve evidence and discovery. Both parties and the court continued to have a heated discussion, and the prosecutor claimed that "there are no notes." *Id.* at p. 366. Detective Isom, who was also present at the quarry, did not know if any notes existed.

**{¶67}** Detective Isom indicated to the court that he could get the notes to the prosecutor within twenty minutes if they existed. The prosecutor stated that she would give defense counsel the notes immediately upon receipt from the detectives. With these objectives in mind, the case was adjourned for the day.

**{¶68}** Upon reconvening the next day, the prosecutor stated that she received notes from Detective Baldridge the previous night but did not give the notes to defense counsel. Defense counsel renewed his request for a dismissal based on the numerous amount of discovery violations. Defense counsel also argued that the

case should be dismissed due to the court's involvement in laying the foundation for the video/audio footage. He added that he did not believe the State would be calling the CI. In response, the court believed defense counsel was being dishonest because defense counsel saw the CI at the suppression hearing and that the State indicated they would be calling the CI as a witness at the trial during the suppression hearing.

{¶69} During the course of discussing several issues with the case, defense counsel indicated his intention on using a few exhibits that he got the previous night. The State argued this constituted a discovery violation, but the court disagreed.

{¶70} The court proceeded to conduct an in-camera review of Detective Baldridge's notes to determine if parts of it had to be redacted. Ultimately, the court redacted the names of other potential targets dealing illegal drugs. The prosecutor claimed that she had never seen the notes before, but the court reminded the prosecutor that she was responsible for disclosing all evidence in possession of the State, not just the prosecutor's office.

{¶71} After defense counsel was handed the newly redacted copy of Detective Baldridge's notes, defense counsel objected stating that he was originally handed a copy of Detective Baldridge's notes that contained only one paragraph while the rest of the notes were covered up by a blank piece of paper. In acknowledging yet another discovery violation by the State, the court concluded

that the content of Detective Baldridge's notes did not contain anything "monumental or some huge surprise." Trial Tr. Vol. II, p. 413. Defense counsel renewed his motion for dismissal based on prosecutorial misconduct, which was denied by the court.

{¶72} Defense counsel proceeded to claim that he needed a month to investigate the contents of Detective Baldridge's notes and the identity of the black male in the house during the controlled buy. The court stated that it thought that none of this information was shocking or surprising. Defense counsel disagreed and stated that he was surprised. The court found defense counsel's claims not credible.

{¶73} At the conclusion of this discussion, the jury was brought back in, and cross-examination resumed.

{¶74} Campbell admitted that he used to sell drugs, but no longer does it. Campbell identified a photograph depicting a man named John Piatt. Campbell explained that he and Piatt were friends and that Piatt died of a drug overdose three weeks prior to trial. Campbell stated that he was with Piatt the day Piatt died, but was not with Piatt when Piatt passed. Campbell identified a separate photograph of him and Piatt. In the photograph, Piatt was holding a large amount of cash.[1]

{¶75} On re-direct-examination, Campbell explained that "Tio" does not specifically refer to Valdez only. He added that "Tio" is Spanish for uncle and that

---

[1] It appears that defense counsel was attempting to impeach Campbell by discussing Piatt and Campbell's possible involvement with Piatt's death.

he has called several people by that name. He testified that the other person in the house during the controlled buy was Dontez Faggs. He stated that Faggs did not sell him the drugs and reaffirmed that Valdez was the one who sold him the drugs.

{¶76} Samuel Fortner was the next witness to testify on behalf of the State. Fortner testified that he worked as a forensic scientist at BCI located in Bowling Green. Fortner explained that his duties at BCI were to analyze substances for the presence or absence of a controlled substance. He testified that he has conducted this type of an analysis approximately 3,500 times. The State moved for Fortner to be declared an expert witness in the field of scientific analysis of controlled substances to determine identity and weight. Before the court could make its decision, defense counsel asked to inquire about Fortner's qualifications.

{¶77} During defense counsel's examination of Fortner's qualifications, Fortner explained the process by which he analyzes the substances for the presence or absence of a controlled substance. He discussed how there are two tests: presumptive and confirmatory. Fortner stated that cocaine can be cut with a number of things, including Benadryl, caffeine, Lidocaine, Procaine, and similar things. He admitted that he does not perform any quantitative analysis or purity testing. Thus, he explained that the results will only show whether cocaine was present, not how much of the substance was cocaine. At the conclusion of this examination, defense

counsel objected to Fortner being declared an expert. The court disagreed and declared Fortner an expert in his field.

**{¶78}** Upon resuming direct-examination, Fortner testified that he analyzed one sample in this case. He identified the substance suspected to be cocaine for the jury. Based on his testing, Fortner explained that he was able to determine that the sample contained cocaine and that the sample weighed approximately 29.67 grams. He identified a copy of his report containing his conclusions, which was later admitted into evidence.

**{¶79}** Detective Andrew Isom of the Marion Police Department was the next witness to testify on behalf of the State. Detective Isom testified that he was assigned to the MARMET drug task force. Detective Isom stated that he took part in the July search of 142 Grand Street.

**{¶80}** He testified that he talked with Valdez and advised him of his constitutional rights. According to Detective Isom, Valdez told the officers that he did not keep any drugs in the house around his children. He added that Valdez also admitted that there were some pills and $11,000 in the house. During this conversation, Valdez also admitted that the money was drug proceeds.

**{¶81}** Detective Isom testified that he talked with Valdez a second time on July 9, 2015 when Valdez was served the "seizure forfeiture notice." Detective Isom identified two original notices, one that was kept by the police department and

one that was given to Valdez, which were later admitted into evidence. He stated that Detective Baldridge and Valdez signed Valdez's notice, while the department's copy contained the signatures of Baldridge, Valdez, and Detective Lowe. He confirmed that the process is "[the document is] filled out, [Valdez] reads it and then he signs it, and then he's given this document." *Id.* at p. 486. Detective Isom stated that there were no substantive differences between the two documents. He added that a defendant is not required to sign the document, although Valdez did in this case.

**{¶82}** On cross-examination, Detective Isom admitted that no drugs were found during the July 9, 2015 search.

**{¶83}** Detective Matt Baldridge of the Marion Police Department was the last witness to testify on behalf of the State. Detective Baldridge testified that he was assigned to the MARMET drug task force and was the lead investigator in the Valdez case. He stated that he was contacted by Campbell, who was looking to work off low level felony drug charges, about being a CI. He added that he and Campbell entered into a CI agreement where Campbell agreed to purchase drugs from Valdez in exchange for the State's promise to drop any charges related to the April 23, 2015 incident. He testified that Campbell believed he was caught with ecstasy, but it was actually a form of bath salts.

**{¶84}** Detective Baldridge testified that a controlled buy was set up via text messages between Campbell and Valdez on May 4, 2015. He identified photographs he took of Campbell's phone, which depicted the text messages sent between Campbell and Valdez, which were later admitted into evidence. He explained that an ounce contains approximately 28 grams.

**{¶85}** Detective Baldridge explained that whenever he or anyone in the task force sets up a controlled buy he gets the buy money from a safe in the police department and photographs the money. He identified photographs of the buy money from the May 4, 2015 buy, which were later admitted into evidence. He expounded that the reason for photographing the money was so that the police could identify any money found on a suspect's person or in a suspect's home pursuant to the execution of a search warrant.

**{¶86}** Detective Baldridge testified that Campbell's car and person were searched prior to the controlled buy. He added that he equipped Campbell with an Oculus, which was a camera that recorded video, and a body wire and gave Campbell $1,200 in buy money for the cocaine. After Campbell left for Valdez's home, he explained that he and Lieutenant Adkins followed Campbell to make sure Campbell did not make any stops.

**{¶87}** He testified that he was able to listen to the audio while Campbell was conducting the controlled buy. He explained that Valdez and Campbell were

discussing weight and that Campbell was getting a little extra, which Campbell called some love. After the buy was done, Detective Baldridge stated that he followed Campbell back to the meeting place where Campbell gave him the cocaine and $200. He added that Campbell and Campbell's car were searched again.

**{¶88}** Detective Baldridge stated that he watched the video recording of the controlled buy later that day. He explained that the audio he heard while the controlled buy was going on matched the audio from the video recording. He added that he was able to identify Valdez as one of the individuals in the video recording.

**{¶89}** Detective Baldridge testified that he took part in the July search and that Valdez told him that the $11,000 found during the search were drug proceeds.

**{¶90}** On cross-examination, Detective Baldridge admitted that none of the May 4, 2015 buy money was ever found. He stated that he was not present with Campbell for all of the text messages sent by Campbell to Valdez.

**{¶91}** At the conclusion of Detective Baldridge's testimony, the State rested.

**{¶92}** Defense counsel moved for an acquittal pursuant to Crim.R. 29, which was denied by the court.

**{¶93}** After the defense exhibits were admitted into evidence, the defense rested.

{¶94} After deliberating, the jury found Valdez guilty of the sole count of trafficking in cocaine.[2]

{¶95} On November 30, 2015, the State filed its sentencing memorandum.

{¶96} Valdez filed his sentencing memorandum on December 8, 2015.

{¶97} A sentencing hearing was held on December 11, 2015. On Count Two (Trafficking in Cocaine), the court imposed a mandatory prison term of eight years. On Count Three (Trafficking in Heroin), the court imposed a prison term of 36 months. The court ordered the two prison terms to be served concurrently for a mandatory total of eight years in prison. The court also ordered the property, consisting of $11,852, described in the forfeiture specifications of Counts Two and Three to be forfeited. The court memorialized its decision in an entry filed on December 15, 2015.

{¶98} Valdez proceeded to file this timely appeal, presenting the following assignments of error for our review.[3]

*Assignment of Error No. I*

**THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO SUPPRESS.**

---

[2] Valdez did not require the State to present evidence as to the forfeiture specification and agreed to forfeit his interest in the money contained in the specification. It should also be noted that the money contained in this specification was the same he had already forfeited when he pled guilty to Count Three.

[3] Valdez's current appeal only concerns his conviction under Count Two (Trafficking in Cocaine). Therefore, we will not discuss his conviction under Count Three (Trafficking in Heroin).

*Assignment of Error No. II*

**THE TRIAL COURT ABUSED IT'S [SIC] DISCRETION AND COMMITTED PREJUDICIAL ERROR IN THE HANDLING OF NUMEROUS CRIMINAL RULE 16 VIOLATIONS COMMITTED BY THE STATE.**

*Assignment of Error No. III*

**THE TRIAL COURT ABUSED ITS DISCRETION IN NOT EXCLUDING THE FRUITS OF A JULY 9, 2015 SEARCH CONTRARY TO EVIDENCE RULE 403.**

*Assignment of Error No. IV*

**THE EVIDENCE WAS NOT SUFFICIENT TO SUPPORT APPELLANT'S CONVICTION FOR AGGRAVATED TRAFFICKING, A FELONY OF THE FIRST DEGREE, AS IT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. I*

{¶99} In his first assignment of error, Valdez argues that the trial court erred by denying his motion to suppress as it related to the May 4, 2015 controlled buy. We disagree.

{¶100} "Appellate review of a decision on a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. The trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented. *State v. Johnson*, 137 Ohio App.3d 847, 850 (12th Dist. 2000). Therefore, when an appellate court reviews a trial court's ruling on a motion to suppress, it must accept

the trial court's findings of facts so long as they are supported by competent, credible evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 100. The appellate court must then review the application of the law to the facts de novo. *Burnside* at ¶ 8.

{¶101} The Fourth Amendment to the United States Constitution, which is made applicable to the states via the Fourteenth Amendment, and Article I, Section 14 of the Ohio Constitution protects people from warrantless searches and seizures. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed. 2d 639 (1980), quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477, 91 S.Ct. 2022, 29 L.Ed. 2d 564 (1971). "The applicability of a 'well-defined and carefully circumscribed' exception to the warrant requirement, however, obviates the unreasonableness that attaches to warrantless searches." *State v. Bump*, 3d Dist. Logan No. 8-12-04, 2013-Ohio-1006, ¶ 37, quoting *Roberts* at ¶ 98, citing *Coolidge* at 454-455. One such exception is when one consents to the search. *See Bump* at ¶ 37.

{¶102} In this case, both parties appear to agree with the trial court's conclusion that the use of audio/video equipment constituted a search. Thus, under the trial court's analysis, the State had to prove an exception to the warrant requirement. In this case, the State advanced the theory that Valdez consented to

the search by allowing Campbell into the home. Thus, the trial court's conclusion necessitates a finding that the use of audio/video equipment by a CI constitutes a search. We are not convinced that such an act constitutes a search.

**{¶103}** "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). It is well established that "[n]o reasonable expectation of privacy * * * exists where an individual willingly exposes criminal wrongdoing to another person." *State v. James*, 3d Dist. Hancock 5-16-14, 2016-Ohio-7262, ¶ 10, citing *State v. Geraldo*, 68 Ohio St.2d 120, 122-123 (1981), citing *Hoffa v. United States*, 385 U.S. 293, 302, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). In revealing any wrongdoing, a person assumes the risk that his accomplice may either report the illegal conduct later to the police or was a government agent or acting as a confidential informant. *Id.*, citing *Geraldo* at 122-123; *United States v. White*, 401 U.S. 745, 749, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), citing *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966).

**{¶104}** "When the associate is a government agent, no Fourth Amendment protection exists for revelations of wrongdoing even if the 'the same agent, unbeknown to the defendant, carries equipment to record the defendant's words and the evidence so gathered is later offered in evidence.' " *James* at ¶ 11, quoting *White*

at 749, citing *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

> If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.

*Geraldo* at 122.

{¶105} This court has recently found that the use of a CI equipped with audio/video recording equipment does not constitute a search when the CI is invited into the home of the defendant to conduct a sale of illegal drugs. *See James* at ¶ 15. In *James*, like in this case, a CI was equipped with audio/video recording equipment and participated in controlled buys of heroin. *Id.* at ¶ 3-5. This court reasoned that there was no expectation of privacy because the CI was invited into the home, the camera was affixed to the CI's person and only depicted the interior of the defendant's home that was visible from the CI's vantage point, the video footage was limited to the duration of the CI's presence in the home, and no additional surveillance equipment was planted in the home by the CI. *Id.* at ¶ 13-15.

{¶106} The facts in this case are similar to those in *James*. Here, Campbell was permitted into Valdez's home by Valdez himself. Unbeknown to Valdez, Campbell was equipped with audio/video recording equipment attached to him by members of the MARMET drug task force. Other than the time it took Campbell

to reach Valdez's home and travel back to the original meeting place with police officers, the duration of the recording was that of Campbell's presence in the house. Campbell did not, by either his own accord or under the orders of police, place any additional surveillance equipment in the house. Thus, as we found in *James*, we find that no search occurred.

{¶107} Having found that no search occurred, we need not address whether the State can show an exception to the search warrant requirement.

{¶108} Accordingly, we overrule Valdez's first assignment of error.

*Assignment of Error No. II*

{¶109} In his second assignment of error, Valdez argues that the trial court erred by mishandling several discovery violations committed by the State resulting in prejudice that required dismissal. In his brief, Valdez alleges violations of both Crim.R. 16 and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, (1963). We disagree.

*Crim.R. 16*

{¶110} In Ohio, discovery in criminal cases is controlled by Crim.R. 16. It states, in part,

> This rule is to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large. All duties and remedies are subject to a standard of due diligence, apply to the defense and the prosecution equally, and are

> intended to be reciprocal. Once discovery is initiated by demand of the defendant, all parties have a continuing duty to supplement their disclosures.

Crim.R. 16. In addition to other information, a defendant is entitled to all reports from law enforcement officers and the full name, address, and criminal record of any witness expected to testify. *See* Crim.R. 16(B)(6)-(7), (I).

{¶111} However, a prosecuting attorney can seek to delay the disclosure of evidence until trial if he or she files a certification of nondisclosure pursuant to Crim.R. 16(D). Under this provision, a prosecuting attorney does not have to disclose if he or she "has reasonable, articulable grounds to believe that disclosure will compromise the safety of a witness, victim, or third party, or subject them to intimidation or coercion * * *." Crim.R. 16(D)(1). A hearing will be held on the matter only upon the motion of the defendant. After the hearing, if the court orders that the prosecuting attorney did not abuse his or her discretion, then the prosecuting attorney must disclose the information before the commencement of trial.

{¶112} If the court determines that a party committed a discovery violation, then "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." Crim.R. 16(L)(1). "When the trial court undertakes to remedy a discovery violation, it should choose the least severe sanction available consistent with the discovery

rules." *State v. Barnes*, 7th Dist. Belmont No. 00 BA 44, 2002 WL 417911, *5 (Mar. 12, 2002), citing *State v. Shade*, 111 Ohio App.3d 565, 567 (6th Dist.1996), citing *State v. Parker*, 53 Ohio St.3d 82, 86 (1990). "Thus, it is generally seen as improper to sanction a party by barring the testimony of a previously undisclosed witness where the violation is not willful and the substance of the witness's testimony does not take the defense completely by surprise." *Barnes* at *5, citing *Shade* at 568.

**{¶113}** To reverse a defendant's conviction due to a discovery violation, it must be shown that " '(1) the prosecution's failure to disclose was a willful violation of the rule; (2) foreknowledge of the information would have benefited the accused in preparing a defense, and (3) the accused * * * suffered prejudice.' " *State v. Wangler*, 3d Dist. Allen No. 1-11-18, 2012-Ohio-4878, ¶ 108, quoting *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 38, citing *State v. Joseph*, 73 Ohio St.3d 450, 458 (1995).

**{¶114}** The decision of whether to exclude a witness's testimony based on a failure to disclose the witness's name lies within the trial court's sole discretion. *State v. Brown*, 8th Dist. Cuyahoga No. 80412, 2002-Ohio-4577, ¶ 13, citing *State v. Maurer*, 15 Ohio St.3d 239 (1984). A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-

278, ¶ 16-18 (2d Dist.). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *State v. Slappey*, 3d Dist. Marion No. 9-12-58, 2013-Ohio-1939, ¶ 12.

{¶115} In the present case, Valdez contends that there were several discovery violations committed by the State that were improperly handled by the trial court. Several of those violations were for the failure to disclose four of the State's witnesses: (1) Lieutenant Adkins; (2) Kathy Caudill; (3) Detective Troutman; and (4) Sam Campbell. We will address Lieutenant Adkins and Caudill together and Detective Troutman and Campbell separately.

{¶116} The trial court found, and we agree, that the State failed to uphold its duty, under the discovery rules, to continue to disclose any information it intended to use at trial. At a minimum, the State's handling of discovery in this case was grossly negligent. However, we need not decide whether the State's violations were willful because Valdez suffered no prejudice from these two particular violations. First, the court did not allow Lieutenant Adkins to testify. Second, Caudill, although permitted to testify, did not testify. Because neither witness testified, Valdez cannot be prejudiced by the State's nondisclosure.

{¶117} Regarding Detective Troutman, the court found that the State had failed to disclose him as a witness in a timely manner. Specifically, Detective Troutman was not disclosed until less than two weeks prior to trial. Nevertheless,

the trial court permitted Detective Troutman to testify because it believed that the detective's testimony was relatively minor. Defense counsel requested a continuance, but was denied by the trial court. Again, we note that the State's handling of discovery was negligent, but again we find reversal is not warranted. Reversal is not warranted because the State's violation was not willful. Unlike Campbell's identity, which the trial court found was willfully withheld at the suppression hearing, there is nothing in the record to suggest that the prosecutor willfully withheld Detective Troutman's identity. Moreover, as the prosecutor stated during trial, she was going through discovery before trial commenced to make sure that she had provided everything to defense counsel. She realized that she had failed to disclose Detective Troutman and, therefore, disclosed him as a potential witness approximately two weeks prior to trial. These statements by the prosecutor indicate possible negligence, but do not rise to a level of willfulness. *See Brown*, 2002-Ohio-4577, at ¶ 19, citing *State v. Scudder*, 71 Ohio St.3d 263, 269 (1994) ("* * * Ohio law establishes that no willfulness exists where the State is merely negligent in its investigation.). Therefore, the trial court did not err by allowing Detective Troutman to testify.

**{¶118}** Finally, the trial court did not err by allowing Campbell to testify. Although the State, and the trial court, argues that Campbell was disclosed during the suppression hearing, we are not convinced. Crim.R. 16 unambiguously requires

the State to provide defense counsel with the full name, address, and criminal record of any potential witness the State intends to call upon at trial. Moreover, Crim.R. 16 imposes a continuing duty to disclose upon both parties. Campbell was never properly disclosed under Crim.R. 16. Although Campbell's criminal record was disclosed, the State failed to provide defense counsel with Campbell's full written name and Campbell's address. Further, the prosecutor did not follow the proper steps to withhold disclosure as she never filed a certificate of nondisclosure.

{¶119} We share defense counsel's concern regarding the court's decision that hearing a witness's name in court is sufficient disclosure under the rule. Simply hearing a name cannot be sufficient as there can be several different people with the same name, there are names with different spellings (Caitlyn, Caitlin, Kaitlin, Kaitlyn, Kate Lynn, etc.), or the name could be misheard by the defense team (heard Johnson, not Johnston). In that regard, the trial court's conclusion was erroneous. However, this does not require reversal in this case.

{¶120} It is important to note that our analysis is regarding the violation to disclose Campbell as a *trial* witness, rather than a witness at the suppression hearing. For the purposes of the suppression hearing, the State's violation was clearly willful. However, we cannot say the same regarding Campbell as a trial witness. At trial, the State relied upon the court's statement that Campbell was disclosed as a witness during the suppression hearing. The State also indicated that the CI Operative

Agreement and Campbell's criminal record were both disclosed to the defense prior to trial. Nothing in the record at trial suggests that the prosecutor willfully did not disclose Campbell's written name and address. Again, negligence is not willfulness. Thus, we find that the State's violation was not willful.

{¶121} However, even if we assume, arguendo, that the State's violation was willful, Valdez has failed to demonstrate any resulting prejudice. Defense counsel's concern regarding Campbell clearly involved the details of Campbell's agreement with MARMET. Defense counsel continuously indicated that he was unaware of the "proffer," referring to the initial conversation between Campbell and MARMET about becoming a CI. Although the CI Operative Agreement was never admitted, and thus not made part of our record, it was discussed at length and revealed that Campbell agreed to become a CI in the Valdez investigation in exchange for the State's promise that no charges would be filed regarding an April 2015 incident where he was found to be in possession of illegal drugs.

{¶122} Defense counsel also indicated that he was surprised by Campbell's appearance as a witness and requested a month-long continuance to perform an investigation. The trial court did not find defense counsel's claims of surprise to be credible. The record appears to support the trial court's position. At the suppression hearing, the State indicated that it expected to call Campbell as a witness at trial,

and the court stated that Campbell was disclosed as a witness. Moreover, defense counsel was given the audio/video footage from the controlled buy.

{¶123} Additionally, although defense counsel claimed that he was not prepared to examine Campbell, defense counsel performed a lengthy and effective cross-examination of Campbell. *Compare with Barnes*, 2002 WL 417911, at *5 ("Moreover, notwithstanding Appellant's claim that this witness took the defense by surprise, during cross-examination counsel was still able to elicit testimony which appears to support the defense theory that the witnesses were conspiring with the victim to help her gain custody of the couple's children."). During cross-examination, defense counsel was able to elicit a confession from Campbell that not only had Campbell used drugs in the past, Campbell was also a prior drug dealer. Defense counsel was also able to effectively cross-examine Campbell regarding the "proffer" in the case.

{¶124} During the discussions regarding whether Campbell should be allowed to testify, the court indicated that it was trying to accommodate defense counsel and indicated that Campbell could be "retained"[4] if further cross-examination was required. A continuance was previously granted after the suppression hearing so that defense counsel could perform additional investigation after Campbell was "disclosed." Defense counsel, rather than asking for a

---

[4] This was the term used by the trial court. Trial Tr., p. 418.

reasonable continuance at trial, repeatedly requested a dismissal with prejudice given the discovery violations. However, the law did not require that the trial court grant defense counsel's motion. Rather, the court had a duty to choose the least severe sanction available. The court did so in this case.

{¶125} Valdez also argues that the State's failure to disclose Detective Baldridge's notes regarding the "proffer" constituted reversible error. The State clearly violated Crim.R. 16 by failing to disclose the detective's notes. The State's argument that the prosecutor was unaware that the notes existed is irrelevant as the prosecutor is accountable for all information in the possession of law enforcement. *See Kyles v. Whitley*, 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Thus, the State was required to disclose the notes to the defense. However, the violation was not willful as the prosecutor was unaware that the notes existed, although it clearly arose to a level of negligence. Additionally, the notes were disclosed at the earliest time possible since the notes were discovered after the prosecutor left the office for the night. Finally, Valdez has failed to show any resulting prejudice.

*Brady Issue*

{¶126} "It is well settled that the prosecution's suppression of evidence favorable to an accused violates due process where the evidence is material either to guilt or punishment, irrespective of the prosecution's good or bad faith."

*Wangler*, 2012-Ohio-478 at ¶ 97, citing *Brady*, 373 U.S. at 87. " 'The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.' " *State v. Jackson*, 57 Ohio St.3d 29, 33 (1991), quoting *United States v. Agurs*, 427 U.S. 97, 109-110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Evidence is considered material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles* at 434. The burden of proving a *Brady* violation rising to a denial of due process lies with the defense. *Wangler* at ¶ 99, citing *State v. Iacona*, 93 Ohio St.3d 83, 92 (2001), citing *Jackson* at 33.

*Witness Testimony*

**{¶127}** Regarding the four witnesses that were not properly disclosed, Valdez has failed to prove how their testimony was favorable or how it rendered his trial unfair. Lieutenant Adkins was not permitted to testify, but it appears that his testimony would have been cumulative to Detective Baldridge's testimony regarding the controlled buy. Caudill was never called to testify, although she

would have only testified to chain of custody. Detective Troutman was permitted to testify, but this court fails to see how his testimony was favorable to Valdez. Also, unlike Campbell, who was never fully disclosed, Detective Troutman was disclosed approximately two weeks prior to trial. Finally, Campbell, the State's key witness, did not provide anything favorable to the defense. Thus, we find that Valdez has failed to show reversible error regarding each witness's testimony.

*Detective Baldridge's Notes*

{¶128} Valdez also argues that Detective Baldridge's notes constituted *Brady* material and that the failure to disclose the notes resulted in prejudice. We are not convinced. Upon a review of the notes, they could possibly be interpreted as being favorable to the defense. As the court noted, the notes indicated that a third individual was present in the home during the controlled buy named Dontez Faggs. This information would have been helpful for the defense's theory that Valdez was not the person who sold the drugs to Campbell. However, just because this evidence was favorable to Valdez does not mean a reversal is required. It still must be considered material. After reviewing the record, we conclude that the detective's notes were not material. The notes included information that was almost entirely incriminating towards Valdez. Further, failing to disclose that Faggs was in the house would not have put the whole case in such a different light as to undermine

confidence in the verdict because Valdez already knew that Faggs was the third individual present because Valdez was there.

**{¶129}** Accordingly, we overrule Valdez's second assignment of error.

*Assignment of Error No. III*

**{¶130}** In his third assignment of error, Valdez argues that the trial court erred by admitting into evidence the fruits of the July 9, 2015 search contrary to Evid.R. 403. He states that the failure to exclude this evidence resulted in prejudice. We disagree.

**{¶131}** Evid.R. 403(A) mandates that relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or misleading the jury." "Evidence is relevant when it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *State v. Bower*, 3d Dist. Shelby 17-14-14, 2015-Ohio-1889, ¶ 15, quoting Evid.R. 401. " 'Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision.' " *State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 122, quoting *State v. Calhoun*, 11th Dist. Ashtabula No. 2010-A-0057, 2012-Ohio-1128, ¶ 82. We review a court's decision to admit evidence pursuant to Evid.R. 403 for an abuse of discretion. *Bower* at ¶ 15, quoting *State v. Nevins*, 171 Ohio App.3d 97, 2007-Ohio-1511, ¶ 49 (2d Dist.),

quoting *State v. Harding*, 2d Dist. Montgomery No. 20801, 2006-Ohio-481, ¶ 21. A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *Boles*, 2010-Ohio-278 at ¶ 16-18. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Slappey*, 2013-Ohio-1939 at ¶ 12.

{¶132} Valdez argues that all of the evidence presented from the July 9, 2015 search should have been excluded as unfairly prejudicial under Evid.R. 403(A). This includes the photographs identified by Detective Troutman, the physical evidence obtained, the inventory sheets from the search, and any statements Valdez made to law enforcement officials on that date. We agree.

{¶133} Originally, Valdez was charged with three counts of various drug trafficking offenses that took place on three different dates: April 28, May 4, and July 6, 2015. The count from the April 28 incident was dismissed, and Valdez pled guilty to the July 6 incident. In support of its case regarding the May 4 drug trafficking, the State wanted to admit several pieces of evidence obtained from the July 9, 2015 search, which was more than two months after the May 4 incident. The evidence included more than $11,000 in cash, which Valdez admitted during the search were drug proceeds, and photographs of the interior of the house and other objects that were indicative of someone dealing in drug trafficking.

{¶134} Turning to Valdez's arguments, he first argues that none of the evidence was relevant to the May 4 incident since the search was performed more than two months after the May 4 incident and that none of the buy money from the May 4 incident was found. We are not convinced.

{¶135} The evidence found pursuant to the July 9 search was clearly relevant. Notwithstanding the fact that no drugs were found during the search, several pieces of evidence gathered from the search were indicia of someone dealing in drug trafficking. Detective Troutman testified about how several of the things found inside the home were used by people engaging in the sale of illegal drugs: police scanner, rubber bands, plastic baggies, door barricade, and a ledger. Moreover, several officers testified that Valdez admitted that the $11,000 were drug proceeds. Therefore, we find that the evidence gathered pursuant to the July 9 search was relevant under Evid.R. 401.

{¶136} Valdez next argues that even if the evidence was relevant then it was unfairly prejudicial and should have been excluded for the same reasons argued above. We agree with Valdez.[5]

---

[5] In his brief, Valdez relies on cases involving the use of prior convictions of a defendant to prove an essential element when the defendant offered to stipulate to the prior conviction so as to avoid any unfair prejudice. We agree with the State's position that these cases are inapplicable in this case as no prior conviction was required to convict Valdez. Further, for our analysis, we must look at this particular case in a vacuum. Thus, we cannot consider the July 6 incident. For our purposes, it is like it never happened and the only two dates that are relevant are the May 4 controlled buy and the July 9 search. Nonetheless, we agree with the core of Valdez's argument.

**{¶137}** In this case, the connection between the controlled buy on May 4 and the resulting search on July 9 is too attenuated. First, the search of Valdez's house occurred more than two months after the controlled buy in this case. Thus, the inference that what was in the house on the day of the search would have also been in the house on the day of the controlled buy becomes extremely weak. There was no testimony that the items found during the July 9 search were there during the controlled buy. Had Campbell offered such testimony, that information might have connected an otherwise lengthy time gap. Second, none of the marked buy money from the May 4 controlled buy was found. Of the more than $11,000 found during the search, none of it was from the controlled buy at issue here. Again, this fact is less probative of the claim that Valdez was selling drugs on May 4 and was highly prejudicial. The same can be said of his statements to the officers that the $11,000 was drug proceeds. They were probative that Valdez was selling drugs on or about July 9, the day of the search, but not so probative that he was selling drugs on or about May 4. Therefore, we find that the trial court erred by admitting the fruits of the July 9 search into evidence.

**{¶138}** Even though the trial court erred in admitting the fruits of the July 9 search, we nevertheless find that there was no reversible error in its admission. The State presented an ample amount of evidence in support of Valdez's conviction. Campbell testified that he contacted MARMET officers about setting up a

controlled buy of cocaine from Valdez on May 4. He stated that he met with the officers, who searched him and his vehicle, equipped him with audio/video recording equipment, and gave him $1,200 for the drugs. Campbell explained that he went to a house where Valdez was and was let into the house by Valdez. He added that he gave Valdez $1,000 in exchange for the drugs. The video recording, although it did not show any exchange of drugs for money, corroborated Campbell's testimony. Finally, Fortner testified that the substance, which Campbell purchased, tested positive for cocaine. Thus, the trial court's error in failing to exclude the evidence from the July 9 search was harmless in this instance.

{¶139} Accordingly, we overrule Valdez's third assignment of error.

*Assignment of Error No. IV*

{¶140} In his fourth assignment of error, Valdez argues that the trial court erred by entering a verdict that was not supported by sufficient evidence and that was against the manifest weight of the evidence. We agree.

{¶141} First, we note that Valdez has combined two arguments into one assignment of error. Although Valdez has argued both sufficiency and manifest weight as one argument, they are in fact two separate legal theories, each with their own standard of review. Therefore, we will address the two separately.

*Sufficiency of the Evidence*

{**¶142**} When an appellate court reviews the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47. Sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, the question of whether the offered evidence is sufficient to sustain a verdict is a question of law. *State v. Wingate*, 9th Dist. Summit No. 26433, 2013-Ohio-2079, ¶ 4.

{**¶143**} If a person knowingly sells or offers to sell a controlled substance, which is identified as cocaine or a substance containing cocaine, he is guilty of trafficking in cocaine. R.C. 2925.03(A)(1), (C)(4). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "Cocaine" is defined as

    (1)   A cocaine salt, isomer, or derivative, a salt of a cocaine isomer or derivative, or the base form of cocaine;

    (2)   Coca leaves or a salt, compound, derivative, or preparation of coca leaves, including ecgonine, a salt, isomer, or derivative of ecgonine, or a salt of an isomer or derivative of ecgonine;

> (3)  A salt, compound, derivative, or preparation of a substance identified in division (X)(1) or (2) of this section that is chemically equivalent to or identical with any of those substances, except that the substances shall not include decocainized coca leaves or extraction of coca leaves if the extractions do not contain cocaine or ecgonine.

R.C. 2925.01(X). Trafficking in cocaine is typically a felony of the fifth degree. R.C. 2925.03(C)(4). However, "If the amount of the drug involved equals or exceeds twenty-seven grams but is less than one hundred grams of cocaine * * *, trafficking in cocaine is a felony of the first degree * * *." R.C. 2925.03(C)(4)(f).

{¶144} Regarding this assignment, Valdez only argues that the State failed to prove how much of the seized substance was actually pure cocaine as opposed to filler, which would lower his conviction to a felony of the fifth degree. In support, Valdez urges this court to adopt the Sixth District Court of Appeals' decision in *State v. Gonzales*, 6th Dist. Wood No. WD-13-86, 2015-Ohio-461, ¶ 45, where the appellate court concluded that "a defendant may be held liable for cocaine offenses under R.C. 2925.11 for only that portion of the dispute substance that is chemically identified as cocaine." The court reasoned that the definition of "cocaine" is more narrow than that of other drugs. For example, "marihuana" is defined as "[a]ny material, compound, mixture, or preparation that contains any quantity of * * * marihuana." R.C. 3719.41(Schedule I (C)(19)). The definition of "cocaine" does not include "material, compound, mixture, or preparation that contains any quantity of" cocaine. *See* R.C. 2925.01(X); 3719.41(Schedule II (A)(4)). Thus, the Sixth

District Court of Appeals concluded that the State was required to present evidence as to the purity of the cocaine, which, in that case, the State failed to do so. *Gonzales* at ¶ 47. The court recognized that its decision was in direct conflict with the Second District Court of Appeals' decision in *State v. Smith*, 2d Dist. Greene No. 2010-CA-36, 2011-Ohio-2568. *Id.* Those cases were accepted for review by the Supreme Court of Ohio. 143 Ohio St.3d 1403, 2015-Ohio-2747. In its decision, the Supreme Court of Ohio found that the statute was unambiguous and affirmed the Sixth District's decision. *State v. Gonzales*, -- Ohio St.3d --, 2016-Ohio-8319, ¶ 20, 23.

{¶145} Whether the statute at issue requires the State to prove the weight of cocaine based on its purity or a total aggregate weight is a matter of statutory interpretation, which we review de novo. *See State v. Stanovich*, 173 Ohio App.3d 304, 2007-Ohio-4234, ¶ 12 (3d Dist.).

{¶146} "Where the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need to apply rules of statutory interpretation." *State v. Taylor*, 114 Ohio App.3d 416, 422 (2d Dist.1996). " 'Where a statute is found to be subject to various interpretations, however, a court called upon to interpret its provisions may invoke rules of statutory construction in order to arrive at the legislative intent.' " *State v. Siferd*, 151 Ohio App.3d 103, 2002-Ohio-6801, ¶ 33 (3d Dist.), quoting *Meeks v. Papadopulos*, 62 Ohio St.2d 187, 190 (1980). "If a statute is ambiguous, a court will seek to interpret the statutory

provision in a way that most readily furthers the legislative purpose reflected in the wording used in the legislation." *Jackson* at ¶ 10, citing *State v. Black*, 142 Ohio St.3d 332, 2015-Ohio-513, ¶ 38.

**{¶147}** Upon a review of the relevant statutes, we find that R.C. 2925.03(C)(4) is unambiguous. For the purposes of penalty enhancement, the language is clear – "the amount of the drug involved equals or exceeds twenty-seven grams but is less than one hundred grams *of cocaine * * *.*" (Emphasis added.) R.C. 2925.03(C)(4)(f). The statutory definition of "cocaine" is very specific and does not include a mixture or other synonym containing cocaine. Therefore, the State must introduce evidence that proves the purity of the cocaine at issue.

**{¶148}** Our interpretation is further supported by the Supreme Court's decision in *Gonzales*. Although *Gonzales* involved the interpretation of R.C. 2925.11 (drug possession) and not R.C. 2925.03 (drug trafficking), the relevant penalty enhancement language of R.C. 2925.11(C)(4)(e) is identical to that of the relevant penalty enhancement language in R.C. 2925.03(C)(4)(f) – "[i]f the amount of the drug involved equals or exceeds twenty-seven grams but is less than one hundred grams of cocaine * * *."

**{¶149}** Turning our attention to the evidence presented at trial, the State failed to present sufficient evidence that the amount of cocaine at issue weighed more than 27 grams but less than 100 grams. Although Fortner testified that the

cocaine weighed approximately 29.67 grams, he admitted that he did not perform any purity testing. He did testify that the texture of the substance was entirely consistent and appeared homogenous, but this is insufficient to prove the weight of pure cocaine present. Accordingly, the State presented sufficient evidence to convict Valdez of a felony of the fifth degree, but not a felony of the first degree. In that regard, Valdez is entitled to have his conviction changed from a felony of the first degree to a felony of the fifth degree. Valdez is also entitled to a new sentencing hearing, where the court can proceed to sentence him on the felony of the fifth degree.

{¶150} We recognize that it is possible that this result may not have been the intention of the legislature. However, it is the result of the language actually used in the statute. When interpreting criminal statutes, the language must "be strictly construed against the state, and liberally construed in favor of the accused." R.C. 2901.04(A).

{¶151} If the general assembly intended a different result it will need to address the issue in corrective legislation. It is not the prerogative of this or any other reviewing court to rewrite the language of the statute, or to interpret the unambiguous language of the statute.

{¶152} Accordingly, we sustain Valdez's fourth assignment of error.

*Manifest Weight of the Evidence*

{¶153} Having found that the State failed to present sufficient evidence regarding the penalty enhancement, Valdez's arguments concerning the manifest weight of the evidence are rendered moot and need not be considered. App.R. 12(A)(1)(c).

{¶154} Having found error prejudicial to the appellant, in some of the particulars assigned and argued, we affirm, in part, and reverse, in part, the judgment of the trial court, and remand the matter for proceedings consistent with this opinion.

***Judgment Affirmed in Part,***
***Reversed in Part and***
***Cause Remanded***

**WILLAMOWSKI, J., concurs separately; and concurs in Judgment Only as to Assignment of Error No. IV.**

{¶155} I concur fully with the lead opinion as to assignments of error I, II and III. I write separately only as to assignment of error IV. In reviewing *State v. Gonzales*, -- Ohio St.3d --, 2016-Ohio-8319, I am drawn to the dissent of Chief Justice O'Connor, joined by Justices O'Donnell and French, as being logical and likely reflective of the actual intent of the legislature on the issue raised in assignment of error IV in this case. Nonetheless, as the majority of justices, even though they reached their same conclusion two separate ways, concluded and held that in prosecuting cocaine-possession offenses under R.C. 2925.11(C)(4)(b)

through (f) involving mixed substances, the state must prove that the weight of the actual cocaine, excluding the weight of any filler materials, meets the statutory threshold, and noting that the relevant penalty enhancement language of R.C. 2925.11(C)(4)(e) is identical to that of the relevant penalty enhancement language in this case (R.C. 2925.03(C)(4)(f)), I must reluctantly concur in judgment only as to assignment of error IV.

**PRESTON, P.J., concurs as to Assignments of Error Nos. I, II and III; dissents as to Assignment of Error No. IV.**

**/jlr**